[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 10, 2003
THOMAS K. KAHN
CLERK

_____

No. 00-12809

_____

D. C. Docket No. 99-00248-CV-JOF-1

BELLSOUTH TELECOMMUNICATIONS, INC.,

Plaintiff-Counter-
Defendant-Appellant-
Cross-Appellee,

UNITED STATES OF AMERICA,

Intervenor-Appellant,

versus

MCIMETRO ACCESS TRANSMISSION
SERVICES, INC.

Defendant-Counter-
Claimant-Appellee,

GEORGIA PUBLIC SERVICE COMMISSION,
ROBERT B. BAKER, JR., in his
official capacity as Chairman,
LAUREN "BUBBA" MCDONALD, in his
offficial capacity as Commissioner,
ROBERT DURDEN, in his official
capacity as Commissioner,
STANCIL O. WISE, in his official

capacity as Commissioner,

Defendants-Appellees-
Cross-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

**(January 10, 2003)**

Before EDMONDSON, Chief Judge, TJOFLAT, ANDERSON,  BIRCH, BLACK, CARNES, BARKETT, MARCUS and WILSON, Circuit Judges.[*]

BARKETT, Circuit Judge:

In this appeal we were originally asked to review two orders of the Georgia Public Service Commission (the "GPSC"), which interpreted the contract between BellSouth Telecommunications, Inc. ("BellSouth") and MCImetro Access Transmission Services, Inc. ("MCImetro), and the contract between BellSouth and WorldCom Technologies, Inc. ("WorldCom").  Both contracts were interconnection agreements mandated by the Federal Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) ("FTCA").   The GPSC was asked

_____

[*]Judges Joel F. Dubina and Frank M. Hull recused themselves and did not participate in the disposition of this case.

2

to interpret the meanings of provisions in each contract which established reciprocal compensation rates for local telephone traffic.[1] BellSouth claimed that calls made to internet service providers ("ISPs") could not be considered "local traffic" subject to reciprocal compensation under the contracts. MCImetro and WorldCom both claimed that such calls were "local" and therefore subject to reciprocal compensation. They demanded payment under their respective contracts and sought relief before the GPSC. The GPSC determined that calls to ISPs were "local traffic" under the contracts and thus reciprocal compensation must be paid by BellSouth. BellSouth then commenced an action in the district court, asserting that the GPSC decision was contrary to federal law and claiming that the district court had jurisdiction under 47 USC § 252(e)(6) and 28 USC § 1331. The district court affirmed the GPSC's order and BellSouth appealed. A split panel of this court did not reach the merits of the appeal, reversing the district court's order on the grounds that there was no statutory authority for the GPSC to interpret and enforce these interconnection agreements in the first instance.

A majority of the judges in active service granted the petition for rehearing en banc filed by MCImetro Access Transmission Services and WorldCom

---

[1]The term "reciprocal compensation rates" simply means that Carrier A would pay Carrier B for any calls made by a Carrier A customer that terminated in Carrier B's network, and vice-versa.

Technologies and vacated the panel opinion in this case. We now address, <u>en banc</u>, the appropriateness of the GPSC's order and the extent of federal jurisdiction over challenges to that order.

Discussion

To address the natural monopoly in place in the telecommunications industry and promote competition in local telephone service, Congress passed the FTCA in 1996. Pub. L. No. 104-104, 110 Stat. 56. Its regulatory scheme was designed to counteract the deterrence of competition inherent in the high, fixed initial cost of telephone service and the need for all customers to interconnect with one another. Thus, in order to open intrastate telephone markets to competition, it required incumbent Local Exchange Carriers ("ILECs"), such as BellSouth, to share access to loops and exchanges with competing LECs ("CLECs"), like MCImetro and WorldCom. 47 U.S.C. § 251(a)(1).[2] The FTCA further required ILECs and CLECs that are sharing resources to "establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C.

---

[2]"Each telecommunications carrier has the duty to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers." 47 U.S.C. 251(a)(1).

4

§ 251(b)(5).[3]  These agreements were to be submitted for approval or rejection to the state public service commission and, in making this determination, the commissions were to consider several specific factors.  47 U.S.C. § 252(e) provides:

> (e) Approval by State commission.
> (1) Approval required.
> Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.
> (2) Grounds for rejection.
> The State commission may only reject--
> (A) an agreement (or any portion thereof) adopted by negotiation under subsection (a) of this section if it finds that--
> (i) the agreement (or portion thereof) discriminates against a telecommunications carrier not a party to the agreement; or
> (ii) the implementation of such agreement or portion is not consistent with the public interest, convenience, and necessity; or
> (B) an agreement (or any portion thereof) adopted by arbitration under subsection (b) if it finds that the agreement does not meet the requirements of section 251 [47 USC § 251], including the regulations prescribed by the Commission pursuant to section 251 [47 USC § 251], or the standards set forth in subsection (d) of this section.
> (3) Preservation of authority.
> Notwithstanding paragraph (2), but subject to section 253 [47 USC § 253], nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements.

---

[3]"Each local exchange carrier has . . .[t]he duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. 251(b)(5).

(4) Schedule for decision.
If the State commission does not act to approve or reject the agreement within 90 days after submission by the parties of an agreement adopted by negotiation under  [47 U.S.C. § 252(a)], or within 30 days after submission by the parties of an agreement adopted by arbitration under [47 U.S.C. § 252(b)], the agreement shall be deemed approved. No State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section.
(5) Commission to act if State will not act.
If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the Commission shall issue an order preempting the State commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission.
(6) Review of State commission actions.
In a case in which a State fails to act as described in paragraph (5), the proceeding by the Commission under such paragraph and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of [47 USC § 251] and this section.

While § 252 expressly gives state commissions authority to approve or reject interconnection agreements, the statute does not specifically say that this empowerment includes the interpretation and enforcement of interconnection agreements after their initial approval.  We agree with all the parties before us, however, that a common sense reading of the statute leads to the conclusion that

the authority to approve or reject agreements carries with it the authority to interpret agreements that have already been approved. We find further support for this conclusion in the recent decision of the Supreme Court in Verizon Md., Inc. v. PSC, 535 U.S. 635, 122 S. Ct. 1753 (2002), in the decisions of all other circuit courts to have considered the question, and in the determination of the Federal Communications Commission, ("FCC"), which is entitled to deference in the interpretation of the pertinent statute. See In re Starpower, 15 F.C.C.R. 11277, ¶ 6, at 1129–80 (2000).

The Verizon case involved a public service commission order like the one before us that had resolved the question of whether calls made to an ISP could be considered "local calls" subject to reciprocal compensation pursuant to the interconnection agreement of the parties. While the procedural posture of Verizon differs from that of the case at bar, the Verizon case arose from a set of facts identical to those here. In Verizon, WorldCom and Verizon had negotiated an interconnection agreement that had been approved by the Maryland Public Service Commission (the "MPSC"). Several months after the interconnection agreement had been approved, Verizon refused to pay WorldCom for calls made to ISPs. WorldCom filed a complaint with the MPSC. The MPSC determined that, as a matter of state contract law, ISP calls were compensable local traffic under the

7

interconnection agreement between Verizon and WorldCom.  Verizon sued the MPSC in federal district court, asserting jurisdiction under 47 U.S.C. § 252(e)(6) and 28 U.S.C. § 1331.  Verizon claimed that the MPSC order violated the FTCA and a ruling of the FCC.  The district court dismissed the action without reaching the merits, holding that neither the FTCA nor 28 USC § 1331 gave it jurisdiction over Verizon's claims against private defendants.  The Fourth Circuit affirmed. The Supreme Court granted certiorari,  addressing the question of "whether federal district courts have jurisdiction over a telecommunication carrier's claim that the order of a state utility commission requiring reciprocal compensation for telephone calls to [ISPs] violates federal law."  Verizon, 535 U.S. at __, 122 S. Ct. at 1754. The Court reversed the Fourth Circuit and held that the federal district court had jurisdiction under 28 U.S.C. § 1331 to review the state utility commission's interpretation of the interconnection agreement at issue.  Id. at 1761.  Because it found jurisdiction under 28 U.S.C. § 1331, the Court did not decide whether there was also jurisdiction under § 252(e)(6).  The determination that the district court did have jurisdiction to review the MPSC's order interpreting the interconnection agreement assumed that the state utility commission had the authority to interpret the interconnection agreements in the first instance.  The Court noted that the "parties dispute whether it is in fact federal or state law that confers this authority,

8

but no party contends that the Commission lacked jurisdiction to interpret and enforce the agreement."  Id. at 1758 n.2.

Other circuits have expressly recognized state commissions' authority to interpret the interconnection agreements at issue.  In Bell Atl. Md., Inc. v. MCI WorldCom, 240 F.3d 279, 304 (4th Cir. 2001), the court noted that: "The critical question is not whether State commissions have authority to interpret and enforce interconnection agreements -- we believe they do -- but whether these decisions are to be reviewed by State courts or federal courts."  As noted, the Fourth Circuit's determination that federal courts did not have authority to hear challenges to the decision of the MPSC was vacated by the Supreme Court in Verizon, 535 U.S. at __, 122 S. Ct. at 1761.  The Fifth Circuit, in Southwestern Bell Tel. Co. v.  PUC, 208 F.3d 475, 479-80 (5th Cir. 2000), noted that "the Act's grant to the state commissions of plenary authority to approve or disapprove these interconnection agreements necessarily carries with it the authority to interpret and enforce the provisions of agreements that state commissions have approved."  In Southwestern Bell Tel. Co. v. Brooks Fiber Communs. of Okla., Inc., 235 F.3d 493, 497 (10th Cir. 2000), the court deferred to the FCC's conclusion that state commissions have the authority to interpret and enforce interconnection agreements.  In  Puerto Rico Tel. Co. v. Telecommunications Regulatory Bd., 189 F.3d 1, 10-13 (1st Cir. 1999),

9

the court held that there was no jurisdiction over a dispute between an ILEC and a

CLEC regarding whether long-distance charges applied to certain cellular calls,[4]

but did not question the state commission's authority to resolve the dispute.[5] In

Illinois Bell Tel. Co. v. Worldcom Techs., Inc., 179 F.3d 566, 573 (7th Cir. 1999),

the court stated that, in deciding a dispute between a CLEC and an ILEC over

whether ISP calls were local traffic, the state commission "was doing what it is

charged with doing in the Act and in the FCC ruling. It was determining what the

parties intended under the agreements." Finally, in Iowa Util. Bd. v. F.C.C., 120

F.3d 753, 804 (8th Cir. 1997), the court commented that "state commissions retain

the primary authority to enforce the substantive terms of the agreements made

pursuant to sections 251 and 252." Iowa Utilities was reversed in part on other

grounds by AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 385 (1999), which

held that, under the FTCA, the FCC has authority to "design a pricing

methodology" and to promulgate rules regarding various other matters.

---

[4]The plaintiffs in Puerto Rico did not allege a violation of federal law, and the parties did not assert 28 U.S.C. § 1331 as a basis for jurisdiction.

[5]The court expressly mentioned "post-approval/rejection determinations" and proceeded to discuss the district court's jurisdiction to review these, not the state commission's authority to make them. Id.

No court has held or suggested that a state commission does not have the authority to interpret and enforce interconnection agreements after they have been approved.  Moreover, the entity charged with the implementation of the FTCA, the FCC,  has clearly stated that state commissions have the authority to interpret interconnection agreements.  In re Starpower, 15 F.C.C.R. 11277.  In Starpower, the FCC held that a determination of whether ISP traffic was subject to reciprocal compensation under an interconnection agreement was a determination that a state commission was required to make under § 252(e)(5).  Id.  In that case, Starpower Communications had asked the FCC to preempt the jurisdiction of the Virginia State Corporation Commission ("Virginia Commission") to resolve disputes over interconnection agreements between Starpower and Bell Atlantic Virginia and GTE South.  Id.  As in this case, the dispute in Starpower was over whether calls to ISPs were local calls.  Id.  Starpower filed petitions with the Virginia Commission against Bell Atlantic and GTE, seeking compensation under the interconnection agreements for calls made to ISPs.  Id.  The Virginia Commission declined jurisdiction in both of Starpower's actions.  Id.  Starpower then petitioned the FCC to hear its complaint.  Id.  Because the Virginia State Corporation Commission had failed to make a determination concerning the dispute over ISP traffic, the FCC

11

assumed jurisdiction of the dispute.[6] Id. at 11278. In determining whether to take

jurisdiction, the FCC stated that it "must first determine whether a dispute arising

from interconnection agreements and seeking interpretation and enforcement of

those agreements is within the states' 'responsibility' under section 252." Id. At

11279. The FCC decided that interpretation and enforcement of interconnection

agreements were responsibilities of the states under section 252, citing

Southwestern Bell, 208 F.3d 475 and Illinois Bell, 179 F.3d 566 for support. Id.[7]

Under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467

U.S. 837 (1984), agency determinations are entitled to due deference if (1) the

statute is silent or ambiguous with respect to the issue at hand and (2) "the

agency's answer is based on a permissible construction of the statute." Id. at 843.

"A court may not substitute its own construction of a statutory provision for a

reasonable interpretation made by the administrator of an agency." Id. at 844.

Although the FCC's ruling in Starpower relied on federal court decisions that were

---

[6]"If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the [FCC] shall issue an order preempting the State commission's jurisdiction of that proceeding or mater . . . and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission." 47 U.S.C § 252(e).

[7]The cited decisions relied on an FCC ruling that was subsequently vacated.

12

based on a vacated FCC ruling, the FCC also pointed out, approvingly, that the courts had based their decisions on a recognition that "due to its role in the approval process, a state commission is well-suited to address disputes arising from interconnection agreements." Starpower, 15 FCC Rcd. at 11280. This observation of the state commissions' suitability for the interpretation of interconnection agreements is not unreasonable, nor is it contrary to the language of the statute.[8]

Moreover, the language of § 252 persuades us that in granting to the public service commissions the power to approve or reject interconnection agreements, Congress intended to include the power to interpret and enforce in the first instance and to subject their determination to challenges in the federal courts. Section 252(e)(6) gives federal courts jurisdiction to review "determinations" made by state commissions. 47 U.S.C. § 252(e)(6). In contrast, § 252(e)(4) abrogates state court jurisdiction "to review the action of a State commission in approving or rejecting an agreement under this section." 47 U.S.C. § 252(e)(4). The use of the word "determination" in § 252(e)(6) rather than a specific reference to the approval or rejection of agreements leads us to believe that Congress did not intend to limit

---

[8]An agency's interpretation of a statute is unreasonable and thus does not merit deference if it is "arbitrary, capricious, or clearly contrary to law." Alabama Power Co. v. FERC, 22 F.3d 270, 272 (11th Cir. 1994) (citing Chevron, 467 U.S. at 844).

state commissions' authority to the mere approval and rejection of agreements. See Russello v. United States, 464 U.S. 16, 23 (1983) ("[Where] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972)). It is reasonable to read the grant of authority in 252(e) as encompassing the interpretation of agreements, not just their approval or rejection.

Given the extensive federal regulation of interconnection agreements and the role state commissions play in their formation, it would be illogical to say that the GPSC's interest in an interconnection agreement is extinguished as soon as the agreement is approved, and that the agreement should thereafter be treated as any other contract.[9] At least one circuit has described state commissions as "deputized federal regulator[s]" authorized to exercise regulatory power and ensure

---

[9] A state commission's authority to approve or reject an interconnection agreement would itself be undermined if it lacked authority to determine in the first instance the meaning of an agreement that it has approved. A court might ascribe to the agreement a meaning that differs from what the state commission believed it was approving – indeed, the agreement as interpreted by the court may be one the state commission would never have approved in the first place. To deprive the state commission of authority to interpret the agreement that it has approved would thus subvert the role that Congress prescribed for state commissions.

14

compliance with federal law as set out in the FTCA. <u>MCI Telcoms. Corp. v. Illinois Bell Tel. Co.</u>, 222 F.3d 323, 344 (7th Cir. 2000). Interconnection agreements are tools through which the FTCA enforced. Thus, it is consistent with the FTCA to have state commissions interpret contracts and subject their interpretations to federal review in the district courts.

Additionally, the Supreme Court has specifically held in <u>Verizon</u> that federal courts have jurisdiction under 28 U.S.C. § 1331 to hear challenges to the orders of state public service commissions interpreting interconnection agreements exactly like the one before us. 122 S. Ct. at 1761. Section 1331 provides that "the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. There is no question that the controversy before us arises under the FTCA and that all of the public service commission's decisions are permeated by federal questions. For example, § 252(e)(2)(A)(ii) requires public service commissions to interpret negotiated agreements prior to approval to ensure that they are "consistent with the public interest, convenience, and necessity." 47 U.S.C. § 252(e)(2)(A)(ii). After an agreement is approved, each party to the agreement is required to "make available any interconnection, service, or network element provided under [the

agreement] to any other requesting telecommunications carrier upon the same

terms and conditions as those provided in the agreement." 47 U.S.C. § 252(i).

The resolution of each issue need not depend completely upon an

interpretation of federal law. For purposes of 28 U.S.C. § 1331 jurisdiction, all

that is required is that there be an arguable claim arising under federal law. As the

Supreme Court said in Verizon:

> "It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case." . . . As we have said, "the district court has jurisdiction if 'the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another,'unless the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such claim is wholly insubstantial and frivolous.'" ... Here, resolution of Verizon's claim turns on whether the Act, or an FCC ruling issued thereunder, precludes the Commission from ordering payment of reciprocal compensation, and there is no suggestion that Verizon's claim is "'immaterial'" or "'wholly insubstantial and frivolous.
>
> 535 U.S. at __, 122 S. Ct. at 1758-59.

In this case, as in Verizon, the complaint alleges that the GPSC's

determination is inconsistent with the FTCA and its implementing regulations and

also argues that the GPSC erred in its interpretation of the contracts. This involves

the same federal question presented in Verizon. Federal courts must resolve the

question of whether a public service commission's order violates federal law and

any other federal question as well as any related issue of state law under its

16

pendent state jurisdiction. Thus, pursuant to <u>Verizon</u>, the Georgia Public Service Commission had the authority to interpret and enforce the interconnection agreements that it had approved in the first instance and the federal district court had jurisdiction over this case pursuant to 28 U.S.C. § 1331. Moreover, through the FTCA, Congress conferred upon the public service commissions the power to interpret and enforce the interconnection agreements mandated by the FTCA and federal district courts have jurisdiction over challenges to these interpretations and enforcement orders.

## CONCLUSION

For the foregoing reasons, we conclude that the Georgia Public Service Commission has the authority under federal law to interpret and enforce the interconnection agreements at issue between the parties and that its determination is subject to review in the federal courts. We refer all other issues to a panel of this Court and instruct the Clerk of the Court to assign this case to the next available oral argument panel to resolve the merits of this case.

EDMONDSON, Chief Judge, concurring in part:

I concur in the judgment of the Court and in the opinion by Judge Barkett, except that I decide nothing about jurisdiction under 47 U.S.C. § 252(e)(6).

ANDERSON, Circuit Judge, concurring, in which BLACK, Circuit Judge, joins:

I concur and join most of the opinion of Judge Barkett. The parties were asked to brief two issues for the en banc court: first, does federal law give state commissions, like the Georgia Public Service Commission ("GPSC"), the authority to resolve disputes between telecommunications carriers regarding the interpretation of the contractual terms of an interconnection agreement that has already been approved pursuant to 47 U.S.C. §252(e); and, second, if not, does Georgia law give the GPSC this authority.

With respect to the first issue, I agree with Judge Barkett that the most plausible reading of the federal statute is that it contemplates that GPSC not only has the expressly stated authority to approve or reject the interconnection agreement at issue here, but also has the implicit authority to interpret the agreement after it has already been approved. I agree with Judge Barkett that it would make little sense to grant the obvious authority to interpret the agreement in connection with the approval thereof, but then deny the authority to later implement and enforce same and resolve disputes as to the original interpretation. In so holding, we are joining the numerous circuit courts of appeal discussed by Judge Barkett, and providing appropriate deference to the Federal Communications Commission ("FCC"). See In re Starpower Communications, 15 FCC Red. 11277,

19

11279, ¶6 (2000).  Having thus resolved that GPSC has authority pursuant to the federal statute, I need not address the second issue briefed by the parties en banc, whether or not such authority might also have been provided by state law.

I also agree with Judge Barkett that the district court had jurisdiction pursuant to 28 U.S.C. §1331 to entertain BellSouth's claim in the instant case.[1]  I agree with Judge Barkett that BellSouth's claim is precisely the same as that presented by Verizon, with respect to which the Supreme Court held that the district court had jurisdiction under 28 U.S.C. §1331.  In both cases, the dispute between the parties revolved around whether or not the incumbent local exchange carrier ("ILEC") (Verizon in the Supreme Court case and BellSouth here) was required to pay reciprocal compensation to a competitive local exchange carrier ("CLEC") with respect to calls to local access numbers of internet service providers ("ISPs").  In both cases, the interconnection agreement between the two parties was one which had been voluntarily negotiated.[2]  In both cases, the public

_____

[1]Because there is §1331 jurisdiction, I would not address whether there may also be jurisdiction under 47 U.S.C. §252(e)(6).  To the same effect, see Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 122 S.Ct . 1753, 1758 (2002).

[2]No party suggests that there is any difference in the language or substance of the interconnection agreement in the two cases that would affect the resolution of this case.

20

service commission had originally approved the interconnection agreement at an earlier time, and the dispute arose later. In both, the dispute was presented to the state agency which rendered its determination resolving the dispute. In both cases, the decision of the public service commission was challenged in federal district court. Thus, the dispute at issue in the instant case is factually identical to that in Verizon, and the posture of the claim before the district court is the same.

BellSouth's claim in the instant case is that the GPSC order is inconsistent with the Act and its implementing regulations. BellSouth's claim is indistinguishable from that asserted by Verizon in the Supreme Court case. Verizon had taken the position that "it would no longer pay reciprocal compensation for telephone calls made by Verizon's customers to the local access numbers of internet providers ("ISPs"), claiming that ISP traffic was not 'local traffic' subject to the reciprocal compensation agreement." Id. at ___, 122 S.Ct. at 1757. After Maryland's Public Service Commission ruled against it, Verizon filed a complaint in the district court challenging the Public Service Commission's order, and claiming "that the determination that Verizon must pay reciprocal compensation . . . for ISP traffic violated the 1996 Act, and the FCC ruling." Id. BellSouth's claim is identical. Like Verizon, BellSouth claims that the GPSC order here, construing ISP calls as "local" and requiring BellSouth to pay

21

reciprocal compensation, violates the Act and its implementing regulations. As in

Verizon, BellSouth relies upon the FCC ruling characterizing such ISP traffic as

non-local. The instant case being indistinguishable from Verizon with respect to

the §1331 jurisdictional issue, I readily conclude that the district court had original

jurisdiction of BellSouth's claim pursuant to §1331.[3]

_____

[3]Judge Tjoflat's comprehensive and forceful opinion deserves comment. Whatever the merit of Judge Tjoflat's position, I respectfully suggest that it is not consistent with Verizon. In attempting to distinguish BellSouth's claim from that of Verizon, Judge Tjoflat draws a distinction between an argument that the agency order is preempted by a federal statute, on the one hand, and on the other hand, an argument that the agency order violated the statute and its implementing regulations. Judge Tjoflat posits that Verizon held there was §1331 jurisdiction over the former, but not the latter. I respectfully submit that this attempt to parse the language of the Verizon opinion is not consistent with the opinion itself. Rather, Justice Scalia's opinion equates the argument that the agency order violated the Act and the FCC ruling, with the argument that the order was preempted by federal statute.

Verizon alleged in its complaint that the Commission violated the Act and the FCC ruling when it ordered payment of reciprocal compensation for ISP-bound calls. Verizon sought a declaratory judgment that the Commission's order was unlawful, and an injunction prohibiting its enforcement. We have no doubt that federal courts have jurisdiction under § 1331 to entertain such a suit. Verizon seeks relief from the Commission's order "on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution must prevail," and its claim "thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n.14, 103 S.Ct. 2890, 77 L..Ed.2d 490 (1983).

Although the jurisdictional issue can begin and end with <u>Verizon</u>, it is appropriate to note, as Judge Barkett does, that §1331 jurisdiction requires only an <u>arguable</u> federal claim, that is, one which is not wholly insubstantial and frivolous. A concise summary of BellSouth's federal question argument illustrates why the Court in <u>Verizon</u> found that the claim was not frivolous and that there was §1331 jurisdiction. BellSouth's several reasons for finding federal question jurisdiction follow.

---

<u>Id.</u> at __, 122 S.Ct. at 1758. The Court first states Verizon's claim as being that the order "violated the Act and the FCC ruling," and with respect to that claim the Court stated: "We have no doubt that federal courts have jurisdiction under § 1331 to entertain such a suit." Then the Court apparently restates the same claim in terms of preemption. Respectfully, I do not believe that the Fourth Circuit on remand from the Supreme Court opinion in <u>Verizon</u> would feel free to parse the holding of the Supreme Court as suggested by Judge Tjoflat. Like Verizon, BellSouth in the instant case claims that the Public Service Commission order violates the Act and its implementing regulations and rulings, the same claim asserted by Verizon in the Supreme Court.

Judge Tjoflat also expresses concern that <u>all</u> state public service commission decisions affecting interconnection agreements will be deemed federal questions and will flood the federal courts. I would not address such <u>other</u> claims; I would address only the claim asserted by BellSouth here, which I submit is the same claim presented by Verizon to the Supreme Court. Incidentally, I note that BellSouth never asserts in its briefs on appeal a state law contract claim. Indeed, BellSouth notes that the district court in an "alternative holding" did address a state contract law issue, but BellSouth argues only that such issue is irrelevant because the contract is governed by federal law and the FCC rulings. Thus, the potential claim – a pure state law claim – that concerns Judge Tjoflat has not been argued and is not before us.

23

First, BellSouth points out that the interconnection agreement at issue here was mandated by federal statute. 47 U.S.C. §251(b)(5).

Second, the federal statute mandates that it be nondiscriminatory. 47 U.S.C. §252(e)(2)(A)(i). This means that the terms of the agreement must be available to all carriers, similar to a tariff.

Third, the statute mandates that the terms of the agreement must be consistent with the public interest, convenience and necessity. 47 U.S.C. §252(e)(2)(A)(ii). BellSouth implicitly suggests that this provision probably adopts and perhaps federalizes well-established state standards.

Fourth, in addition as a practical matter, even a voluntarily negotiated agreement, as here, is cabined by the obvious recognition that the parties to the agreement had to agree within the parameters fixed by the federal standards set out in 47 U.S.C. §§251 and 252. BellSouth reasons that the negotiating parties obviously know that if they do not agree, such standards will be imposed. Section 252(b). Thus, the parties know that they cannot deviate significantly from all of the federally imposed standards. Accordingly, BellSouth argues that significant nondiscriminatory and public convenience standards are absolutely mandatory, and that the rest of the federal standards, including the pricing standards of §252(d), are as a practical matter "coerced" by the federal statute into such agreements.

Fifth, and significant in light of the particular matter at issue – whether ISP calls are "local telecommunications traffic" – BellSouth points out that the definition of "local telecommunications traffic" is set out in regulations promulgated by the FCC. 47 C.F.R. §51.701(b). BellSouth argues that the construction of that federal definition presents a federal question.

Sixth, further with respect to the particular matter at issue, BellSouth argues that the FCC has ruled that ISP calls, such as the ones at issue here, are interstate rather than local in nature, and therefore not governed by the reciprocal compensation provision of §251(b)(5). See Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Inter-Carrier Compensation for ISP-Bound Traffic, 14 FCC Rcd 3689 (1999) (applying an "end-to-end" analysis to exclude ISP calls from reach of § 251(b)(5) on theory that they are indeed not "local"), vacated and remanded by Bell Atlantic Tel. Cos. v. F.C.C., 206 F.3d 1, 5, 8 (D.C. Cir. 2000), reinstated on remand by 16 FCC Rcd 9151 (2001) (FCC determining that it was authorized under §251(g) to "carve out" ISP calls from § 251(b)(5)'s reciprocal compensation provision and establish a "bill and keep" system), remanded by WorldCom, Inc. v. F.C.C., 288 F.3d 429, 434 (D.C. Cir. 2002) (remanding because it rejected the FCC's reliance on § 251(g), but stating that it is likely that the FCC has authority from some other source to

25

elect the system set forth in the remand order).  BellSouth notes that the GSPC in its consideration of these issues and almost every other court have always looked to the FCC rulings in ascertaining the meaning of such terms of art which obviously fall squarely within the core concerns of the agency's expertise.

Seventh, the Supreme Court in Verizon, indicated in dicta that §252(e)(6)[4] may not  be a simple procedural device setting forth federal court subject-matter jurisdiction to review state commissions decisions, but rather "reads like the conferral of a private right of action." 122 S.Ct. at 1759.   If a federal statute creates a private cause of action, there would clearly be a federal question.

Finally, BellSouth argues that the interconnection agreement at issue here should not be considered an ordinary commercial contract because it really constitutes a kind of federally mandated agreement,[5] similar in many ways to a

---

[4]Section 252(e)(6) provides: "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of §§251 and 252."

[5]BellSouth points out that federal law requires of BellSouth the following with respect to the interconnection agreements: (1) to negotiate these agreements to discharge their obligations under the federal act; (2) to enter into good-faith negotiations with a CLEC against its wishes and indeed, even if state law would otherwise prohibit such inter-carrier negotiations and agreements; (3) to agree within the minimum terms subject to governmental approval; (4) to publicly file the agreements; (5) to make the same terms and conditions available to any

tariff, and points to cases holding that the interpretation of such federally mandated agreements raise issues of federal law. See Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd., 460 U.S. 533, 534, 103 S.Ct. 1343, 1343, 75 L.Ed.2d 260 (1983) (notwithstanding that the dispute involves a simple contract collection, the duty and obligation to pay grows out of and is dependant upon the federal act mandating the agreement between the parties); Louisville & N.R.R. v. Rice, 247 U.S. 201, 202-03, 38 S.Ct. 429, 429, 62 L.Ed. 1071 (1918); Western Union Int'l v. Data Dev., 41 F.3d 1494, 1496 (11th Cir. 1995) (same with respect to a suit to collect payment of a tariff under the Communications Act of 1934).[6]

Considering BellSouth's arguments,[7] as summarized above, I cannot conclude that BellSouth makes a merely frivolous claim that the issue before us

---

requesting CLEC; and (6) to provide service in accordance with an approved agreement.

[6]Bell South distinguishes Jackson Transit Auth. v. Local Division 1285, 457 U.S. 24, 102 S.Ct. 2202 (1982), as a case in which there was a clear congressional intent that the contract was to be "governed by state law applied in state courts." Id. at 29, 102 S.Ct. at 2210.

[7]Perhaps the best judicial expression of BellSouth's arguments appears in Southwest Bell Tel. v. Connect Communications Corp., 225 F.3d 942 (8th Cir. 2000). Although the Eighth Circuit there holds the identical claim is subject to federal court jurisdiction pursuant to §252(e)(6), its reasoning parallels BellSouth's argument that the claim presents a federal question over which district courts have original jurisdiction pursuant to §1331.

presents a federal question.   Indeed, as explained above, the Supreme Court in

Verizon so held.

In sum, I conclude that the GPSC had authority to entertain this case, and

that the district court had jurisdiction under 28 U.S.C. §1331 to entertain the claim

presented by BellSouth.[8]  Like Judge Barkett, I would refer other issues to a panel.

BLACK, Circuit Judge, concurring, in which ANDERSON, Circuit Judge, joins:

I concur in Judge Anderson's separate opinion.  I write to expand upon the

deference this Court owes the decisions of the Federal Communications

Commission under Chevron, U.S.A., Inc. v. Natural Res. Def. Counsel, 467 U.S.

837, 104 S. Ct. 2778 (1984).

As Judge Barkett states, agency interpretations of the statutes they are

charged with administering are entitled to deference under a two-step analysis.

First, if Congress has spoken to the precise question at issue, then the

unambiguously expressed intent of Congress governs.  Id. at 842–43, 104 S. Ct. at

---

[8]Because I conclude that the district court has original jurisdiction under 28
U.S.C. § 1331, I need not address whether or not there would have been
supplemental jurisdiction under 28 U.S.C. § 1367 if BellSouth had also presented a
pure state law claim.

2781. Second, if the statute is silent or ambiguous, then the agency's interpretation must be given effect so long as it is based on a permissible reading of the statute. Id. at 843, 104 S. Ct. at 2782. FCC has interpreted the Telecommunications Act to authorize Public Service Commissions to adjudicate post-agreement disputes under 47 U.S.C. § 252. See In re Starpower, 15 F.C.C.R. 11277, ¶ 6, at 1129–80 (2000). Under Chevron, the FCC's interpretation is entitled to deference.

At Chevron step one, the precise question at issue here has no clear answer in the statutory text. We granted rehearing en banc to answer the following question:

> Does federal law, specifically 47 U.S.C. §§ 251 and 252, give state commissions, like the GPSC, the authority to resolve disputes between telecommunications carriers regarding the interpretation of the contractual terms of an interconnection agreement that has already been approved pursuant to 47 U.S.C. § 252(e)?

No statutory text clearly authorizes or forecloses PSC adjudications of post-agreement disputes. The statute authorizes PSCs to "approve or reject" interconnection agreements submitted to them. 47 U.S.C. § 252(e)(1). The statute goes on, however, to refer to "determination[s] under this section." Id. § 252(e)(6). While it may be possible to cabin these "determinations" to PSC decisions approving or rejecting interconnection agreements, "determinations" can also be fairly construed to encompass determinations in post-agreement disputes.

29

Congress could have easily avoided this interpretation by replacing the phrase

"makes a determination under this section" in § 252(e)(6) with the words

"approves or rejects." In this statutory context, the narrower interpretation is

hardly the "unambiguously expressed intent of Congress." Chevron, 467 U.S. at

843, 104 S. Ct. at 2781. Because Congress did not express its intent so clearly, we

must conclude that this statute is ambiguous.[1]

At Chevron step two, we must defer to the agency's interpretation if it is

based upon a permissible reading of the statute. Chevron, 467 U.S. at 843, 104 S.

Ct. at 2782. There should be little doubt that FCC's interpretation in Starpower is

entitled to deference in this case. See S.E.C. v. Zandford, 535 U.S. 813, ___, 122

S. Ct. 1899, 1903 (2002) (finding that an SEC interpretation in the context of a

formal adjudication is entitled to deference). That conclusion is not disturbed by

the recent Supreme Court cases articulating some limits on Chevron deference.

See United States v. Mead Corp., 533 U.S. 218, 228, 121 S. Ct. 2164, 2171 (2001)

---

[1]Judge Tjoflat now claims the statute is unambiguous, indeed, that it is "clear as a bell." Tjoflat opinion at 81. I note, however, Judge Tjoflat's earlier Chevron analysis concluded that the statute was silent on the precise question at issue. See BellSouth Telecomms., Inc. v. MCImetro Access Transmissions Servs., Inc., 278 F.3d 1223, 1235 (11th Cir. 2002) ("In this case, the statute in question, the Federal Telecommunications Act of 1996, is silent as to whether state commissions have the authority to interpret previously approved interconnection agreements."), vacated and reh'g en banc granted by 297 F.3d 1276 (11th Cir. 2002).

(recognizing that "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position") (citations omitted); Christensen v. Harris County, 529 U.S. 576, 587, 120 S. Ct. 1655, 1662–63 (2000) (declining to defer to an agency interpretation reached without formal adjudication or notice-and-comment rulemaking); see also Edelman v. Lynchburg Coll., 535 U.S. 106, ___, 122 S. Ct. 1145, 1150 (2002) ("[D]eference under Chevron does not necessarily require an agency's exercise of its express notice-and-comment rulemaking power") (citation omitted).

Nor is the deference owed to FCC altered by any dissatisfaction we may have with the quality of the agency's legal reasoning in Starpower. Agencies derive their authority to interpret the statutes they administer—and thereby bind federal courts—from Congressional delegation. Chevron, 467 U.S. at 843–44, 104 S. Ct. at 2782.[2] By virtue of that Congressional delegation, an administrative

---

[2]Judge Tjoflat asserts Chevron deference is grounded in the expertise of agency decisionmakers, suggesting that where agencies fail to exercise their expertise, they are entitled to no deference. Tjoflat opinion at 81-82. The Supreme Court in Chevron, however, cited Congressional delegation—not inherent agency expertise—as the source of the authority afforded administrative agencies. See Chevron, 467 U.S. at 843–44, 104 S. Ct. at 2782 ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency

31

agency need not cite any cases in reaching its interpretation; its interpretation is authoritative because it has been posited by the agency. Of course, the agency's interpretation cannot be "procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute," Mead Corp., 533 U.S. at 227, 121 S. Ct. at 2171, and legal errors in the agency's decision might transgress these limits. Within these boundaries, however, an agency is entitled to deference simply because it has acted.[3]

It follows, therefore, that deference to an agency interpretation is not automatically defeated[4] by any perceived weakness in judicial opinions on which

to elucidate a specific provision of the statute by regulation."). Congress may choose to delegate because of the agency's perceived expertise, or, as the Supreme Court has recognized, it may delegate because of a failure to recognize the precise question at issue or because it failed to achieve a legislative compromise that could be codified in the statute. See id. at 865, 104 S. Ct. at 2793. According to the Supreme Court, "For judicial purposes, it matters not which of these things occurred." Id. Agency expertise may give a reason for Congressional delegation, but it is the fact of delegation, not expertise, that provides the source for agency authority.

[3]Judge Tjoflat does not argue that FCC's Starpower decision was procedurally defective or arbitrary and capricious. As discussed above, the ambiguity that exists in the Telecommunications Act means that FCC's interpretation is not manifestly contrary to the statute.

[4]While Judge Tjoflat says initially that he only "hesitates" to defer to FCC's interpretation because of its reliance on the precedents of our sister circuits, Tjoflat opinion at 81, he later cites this as a sufficient reason not to defer. Tjoflat opinion at 83 ("Any of these five reasons standing alone would eliminate the requirement of deference.").

the agency relies in formulating its interpretation. In this respect, an agency interpretation differs from a judicial precedent. The authoritativeness of an opinion might be diminished if its rationale is undermined;[5] a valid agency interpretation, on the other hand, is like a statute, which continues to be authoritative even if the reasons for enacting the statute pass. Like a statute, an agency interpretation is entitled to deference because it has been posited by an institution with authority—in this case, the FCC, which derives its authority from a Congressional delegation. FCC need not have cited any legal precedent in its Starpower decision; its interpretation of § 252 would have been entitled to exactly the same deference from this Court.[6]

---

[5]There are certain well known exceptions to this common law understanding of the authority of judicial decisionmaking. See, e.g., Rodriguez de Quijas v. Shearson/American Express, 490 U.S. 477, 109 S. Ct. 1917 (1989).

[6]For this reason, I think it does not matter that FCC's interpretation is "[h]ardly a model of legal reasoning." Tjoflat opinion at 82, n.37. Nor is there any problem posed by litigants' allegedly "laundering" circuit court opinions through administrative agencies. Tjoflat opinion at 80. If an administrative agency has been delegated authority by Congress to resolve statutory ambiguities, then we can expect the agency to exercise that delegated authority in good faith. If, in its considered judgment, the agency agrees with the result reached by circuit courts confronting the same issue, it can exercise its authority (consistent with any applicable limitations on that authority) to interpret the statute in accordance with those judicial opinions. The agency's interpretation would then be entitled to deference, not because of the authority of the precedents it relied upon, but only because of the authority Congress delegated to the agency to make a decision. Within certain limits, see Mead Corp., 533 U.S. at 227, 121 S. Ct. at 2171, the

I do not think FCC's <u>Starpower</u> decision is based on an impermissible construction of the Telecommunications Act, so we must defer to the agency's interpretation. I concur with the conclusion that the Georgia Public Services Commission has the authority to interpret and enforce the interconnection agreements at issue here.

---

agency need not exercise model legal reasoning because it simply posits its interpretations and thereby renders them binding on the courts.

TJOFLAT, Circuit Judge, dissenting, in which BIRCH, Circuit Judge, joins:

## I. Background

A. *The Telecommunications Act of 1996 and reciprocal compensation*

In 1996, Congress amended the Communications Act of 1934, <u>see</u>

Telecommunications Act of 1996 ("1996 Act"), Pub. L. 104-104, 110 Stat. 56

(codified at 47 U.S.C. § 151 <u>et seq.</u>), in an effort to deregulate the

telecommunications industry – especially the local exchanges once thought to be

entrenched natural monopolies. Sections 251 and 252 form the heart of the 1996

Act. Section 251 imposes several obligations on incumbent local exchange carriers

("ILECs").[1] Section 252 covers the implementation of these obligations, giving

significant authority to states in a regulatory scheme that has been dubbed

"cooperative federalism." <u>See, e.g.</u>, Philip J. Weiser, <u>Chevron, Cooperative</u>

<u>Federalism, and Telecommunications Reform</u>, 52 Vand. L. Rev. 1 (1999). Section

252 establishes two tracks for interconnecting ILECs and competitive local

exchange carriers ("CLECs"). One is the "voluntary" track pursuant to section

---

[1]These include: the duty to negotiate interconnection agreements in good faith; the obligation to interconnect with competitors; the obligation to provide competitors with unbundled access to its network elements ("UNEs") at reasonable rates; the duty to offer for resale at wholesale rates any telecommunications service that the ILEC provides at retail; and the duty to allow collocation of the CLECs' equipment on the ILEC's premises. <u>See</u> 47 U.S.C. § 251(c).

252(a)[2] and section 252(e).[3]  If the ILEC and CLEC enter into a *voluntary agreement*, the state public service commission ("PSC")[4] is charged with the task of approving or rejecting the agreement.  See 28 U.S.C. § 252(e).  There are only two available grounds for rejecting the agreement.  First, the PSC might believe that the agreement is discriminatory and thus unfair to a third-party CLEC.  Second, the PSC might believe that the agreement is inconsistent with the public interest, convenience, and necessity.  See 47 U.S.C. § 252(e)(2)(A).  The PSC *cannot* impose specific obligations on the parties who reach a voluntary agreement.  In other words, the parties are exempt from the specific obligations of section 251.

_____

[2]Section 252(a)(1) states:
   Upon receiving a request for interconnection, services, or network elements pursuant to section 251 of this title, an . . . [ILEC] may negotiate and enter into a binding agreement with the requesting . . . [CLEC] without regard to the standards set forth in subsections (b) and (c) of section 251 of this title.  The agreement shall include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement.  The agreement, including any interconnection agreement negotiated before February 8, 1996, shall be submitted to the State commission under subsection (e) of this section.

[3]Section 252(e)(1) sates:
   Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission.  A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.

[4]The 1996 Act refers only to "state commissions."  "PSC" and "state commission" are used interchangeably throughout this opinion.

See 47 U.S.C. § 252(a) ("[ILECs and CLECs may] enter into a binding agreement . . . without regard to the standards set forth in subsections (b) and (c) of section 251 of this title."). Another option comes into play if the ILEC and CLEC refuse to come to an agreement: the state PSC can *arbitrate* the dispute and, in the process, impose section 251 obligations on the parties. See 47 U.S.C. § 252(b) ("Agreements arrived at through compulsory arbitration"). Both determinations by the PSC – the decision to approve or reject a voluntary agreement and the decision to impose various requirements through arbitration – are reviewable in federal court. See 28 U.S.C. § 251(e)(6).[5]

One obligation that all LECs have under section 251 is the duty to form a reciprocal compensation agreement with competing LECs. See 47 U.S.C. § 251(b)(5). When a customer of LEC *A* calls a customer of LEC *B*, LEC *B* is entitled to demand compensation for terminating the call of LEC *A*'s customer. One option the LECs have is to agree to a "bill and keep" system of compensation whereby each LEC considers the total termination costs a wash, thereby eliminating the necessity of a billing arrangement and its concomitant

---

[5]Section 252(e)(6) states in pertinent part:
In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.

administrative costs.  See Stuart M. Benjamin, Douglas G. Lichtman, and Howard

A. Shelanski, Telecommunications Law and Policy 934 (2001).  Another option is

for each LEC to pay the other for every call termination.  In the past, ILECs and

CLECs have frequently chosen the latter option in their voluntary agreements.

This choice caused ILECs trouble when CLECs sought as their primary customers

certain entities that were net receivers of telephone calls (and therefore rarely

placed calls to the customers of ILECs).  One such customer is the Internet service

provider ("ISP"), whose metaphysical status has caused the FCC tremendous

definitional problems.

   The FCC eventually weighed in, however, in an effort to fix the perceived

asymmetry.[6]  The FCC made the tentative conclusion that ISP-bound calls are

"interstate," rather than "local," and thus not subject to reciprocal compensation

charges.  That is, ILECs were not required to pay CLECs for the termination of

ISP-bound calls.  In accordance with the statute, the FCC left open the possibility

of private agreements to the contrary.  A CLEC and an ILEC could, for example,

_____

   [6]The FCC's initial decision was vacated by the D.C. Circuit.  See
Implementation of the Local Competition Provisions in the Telecomm. Act of
1996; Intercarrier Compensation for ISP-Bound Traffic, 14 F.C.C.R. 3689 (1999),
vacated and remanded sub nom., Bell Atl. Tel. Cos. v. FCC, 206 F.3d 1 (D.C. Cir.
2000).  The FCC eventually issued a new order on remand.  See Implementation of
the Local Competition Provisions in the Telecomm. Act of 1996; Intercarrier
Compensation for ISP-Bound Traffic, 16 F.C.C.R. 9151 (2001), remanded sub
nom., WorldCom, Inc. v. FCC, 288 F.3d 429 (D.C. Cir. 2002).

38

pay each other for the termination of ISP-bound calls notwithstanding the FCC's conclusion that ISP-bound calls are not "local."

B. *This dispute*

The ILEC in this case, BellSouth Telecommunications, Inc. ("BellSouth"), declined to pay reciprocal compensation fees to various CLECs. The Georgia Public Service Commission ("GPSC") adjudicated the dispute, holding that the parties were required to compensate each other for the termination of ISP-bound calls.[7] BellSouth sought review in federal district court of the GPSC's Order, asserting federal jurisdiction under 28 U.S.C. § 1331 and 47 U.S.C. § 252(e)(6). The district court rejected BellSouth's arguments on the merits, holding that (1) the GPSC's Order did not violate federal law and (2) the GPSC's application of Georgia contract law to the voluntary agreement was not an "arbitrary and capricious" analysis.[8] A panel of this court reversed, holding that the GPSC lacked

_____

[7]As will be discussed in part V infra, it is unclear whether the GPSC took one of two positions. Did it hold that the parties intended to compensate each other for the termination of ISP-bound calls because (a) it believed the parties intended to track federal law and (b) federal law defines ISP-bound calls as "local" rather than "interstate" (which would have been an erroneous understanding of federal law)? Or did it believe that the parties contracted to compensate each other for the termination of ISP-bound calls notwithstanding how federal regulations might define ISP-bound traffic?

[8]As the district court framed the issues: "The heart of the present disputes involve two questions: First, did the PSC orders violate federal law, as reflected in the 1996 Act and in the FCC's rules and regulations? Second, did the PSC

39

authority under state and federal law to enforce and interpret interconnection agreements and that this authority must rest with state courts rather than PSCs. The panel also held that the district court lacked jurisdiction under 47 U.S.C. § 252(e)(6).  See BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., Inc., 278 F.3d 1223 (11th Cir. 2002), vacated, BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., Inc., 297 F.3d 1276 (11th Cir. 2002). After the panel's decision was rendered, the Supreme Court issued its decision in Verizon Md. Inc. v. Pub. Serv. Comm'n of Md., __ U.S. __, 122 S. Ct. 1753, 152 L. Ed. 2d 871 (2002), which touches upon many of the issues in this case.

I would hold that (1) the authority of the GPSC under Georgia law is a state law issue that this court should decline to reach, and that federal law does not preclude PSCs from adjudicating post-agreement disputes if states make the choice to allocate adjudicative power to their PSCs;  (2) the district court did not have jurisdiction under 47 U.S.C. § 252(e)(6) for several reasons, not least among which is the fact that the plain language of the statute does not provide for appellate review in the district courts of PSC adjudications of post-agreement disputes; (3) the district court did not have jurisdiction under 28 U.S.C. § 1331 over any of the

_____

correctly interpret the interconnection agreement under Georgia law?"  BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., Inc., 97 F. Supp. 2d 1363, 1376 (N.D. Ga. 2000).

claims BellSouth now presses on appeal,[9] primarily because the posture of the district court was that of an "appellate" court and not a court of "original" jurisdiction; (4) the district court *did* have supplemental jurisdiction over BellSouth's state law "federal element" claim pursuant to the Supreme Court's holding in City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 118 S. Ct. 523, 139 L. Ed. 2d 525 (1997), because the district court had original jurisdiction over the (now-dropped) Verizon-like claim of federal preemption;[10] and (5) on the merits, there is no way the district court could have determined whether the GPSC held (a) that the parties intended to track evolving standards of federal law or (b) that the parties intended to pay each other for the termination of ISP-bound traffic

_____

[9]The Supreme Court did *not* hold that federal jurisdiction exists to review *all* PSC interpretation/enforcement decisions pursuant to 28 U.S.C. § 1331. The only place section 1331 was implicated in Verizon was with regard to the *federal question* – namely, whether a PSC conclusion that the CLECs and the ILEC had agreed to deem ISP-bound calls "local" *is preempted by federal law*. The Court never said that a PSC adjudication of an interconnection agreement inherently entails a federal question. In his concurrence, Justice Souter made clear that the Court was not deciding what the majority of this court claims it decided: "Whether the interpretation of a reciprocal compensation provision in a privately negotiated interconnection agreement presents a federal issue *is a different question which neither the Court nor I address at the present*." Verizon, 122 S. Ct. at 1763 n.4 (emphasis added).

[10]In asserting jurisdiction over the supplemental claim, the the district court should have sat as if it were a Georgia superior court, reviewing the GPSC's decision under the standard of review provided by Georgia law.

notwithstanding federal law.  Accordingly, I would vacate the decision of the district court and instruct it to remand the case to the GPSC so that it can more clearly articulate the basis for its conclusion, and also so that it can adjudicate the dispute in light of the FCC's recent regulations.

## II. Section 1331 Jurisdiction

A. *Is there section 1331 jurisdiction if one assumes, arguendo, that the proceeding before the district court was an "original" proceeding?*

There are many claims in this litigation that are allegedly federal in nature. Assuming, for the moment, that the litigation before the district court in this case was an "original" proceeding, it is questionable whether all of BellSouth's complaints "arise under" federal law for purposes of 28 U.S.C. § 1331.

### 1. Federal preemption

One contention in BellSouth's "petition for judicial review" is that the GPSC's Order violates the 1996 Act and the FCC's regulations thereunder. Although the "petition for judicial review" is unclear on this point, I think I understand BellSouth to be adopting the position more clearly articulated  by the plaintiff in Verizon, where the plaintiff sought relief "'on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail.'" Verizon, 122 S. Ct. at 1757.  An

42

identical cause of action could have been asserted in this case under 42 U.S.C. §

1983 or under Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96, 103 S. Ct. 2890,

2899, 77 L. Ed. 2d 490 n.14 (1983) (holding that plaintiffs may assert a private

right of action directly under the Supremacy Clause of the Constitution).

On appeal, BellSouth no longer disputes that the GSPC could have ordered

the parties to pay each other for the termination of ISP-bound calls, and for good

reason: the FCC has consistently promulgated regulations, consistent with the 1996

Act's affinity for voluntary agreements, that enable ILECs and CLECs to enter into

reciprocal compensation agreements on the subject of ISP-bound traffic

notwithstanding any federal regulations that might deem ISP-bound traffic

"interstate" as a matter of law.  In the FCC's first (and now-vacated) ISP ruling, for

example, the FCC was careful to note that "parties may voluntarily include this

[ISP-bound] traffic within the scope of their interconnection agreements" as those

agreements are "interpreted and enforced by state commissions."  Implementation

of the Local Competition Provisions in the Telecomms. Act of 1996; Intercarrier

Compensation for ISP-Bound Traffic, 14 F.C.C.R. 3689, ¶ 12, at 3703 (1999).  The

FCC concluded, "Nothing in this Declaratory Ruling, therefore, necessarily should

be construed to question any determination a state commission has made, or may

make in the future, that parties have agreed to treat ISP-bound traffic as local

43

traffic under existing interconnection agreements." Id. ¶ 24, 3704. On remand from the D.C. Circuit, the FCC reached an identical conclusion. See Implementation of the Local Competition Provisions in the Telecomms. Act of 1996; Intercarrier Compensation for ISP-Bound Traffic, 16 F.C.C.R. 9151, ¶ 82, at 9189 (2001) ("The interim compensation regime we establish here . . . does not alter existing contractual obligations, except to the extent that parties are entitled to invoke contractual change-of-law provisions. This Order does not preempt any state commission decision regarding compensation for ISP-bound traffic for the period prior to the effective date of the interim regime we adopt here."). Since the GPSC's conclusion that BellSouth owed the CLECs reciprocal compensation fees was based upon its interpretation of the voluntary interconnection agreement, federal law certainly creates no impediment to the GPSC Order. Indeed, I might be inclined to find that BellSouth's claim does not meet the standard for well-pleaded complaints under Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L. Ed. 939 (1946), and its progeny. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89, 118 S. Ct. 1003, 1010, 140 L. Ed. 2d 210 (1998) (district courts do not have jurisdiction if the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial or frivolous"). However, the Supreme Court held that an identical claim in Verizon

44

was not "immaterial" or "wholly insubstantial and frivolous," <u>Verizon</u>, 122 S. Ct. at 1758-59, and so this court is obliged to extend BellSouth the same treatment as that received by Verizon.

### 2. "Coerced" contracts and federal common law

Another argument is that either the rule of decision for *all* post-agreement disputes is some sort of federal common law of contracts, or else the disputes "arise under" federal law even if state law provides the rule of decision because the agreements are "coerced" by the federal government and they are an integral part of a federal regulatory scheme. Therefore, BellSouth argues, all interconnection disputes can wind up in federal court pursuant to 28 U.S.C. § 1331.

### a. "Coerced" contracts

The fact that the interconnection agreements are "coerced" and made pursuant to a federal regulatory scheme is not enough to make run-of-the-mill contract claims – say, a dispute over performance or price – subject to section 1331 jurisdiction. If state law is the rule of decision, then ordinary contract claims would not raise a "federal issue" for district courts to resolve. Indeed, one Supreme Court case has expressly held that a federally compelled contractual provision was not to be construed in federal court under principles of federal law, but rather under state law applied in state courts. <u>See</u> <u>Jackson Transit Auth. v.</u>

45

Local Div. 1285, Amalgamated Transit Union, 457 U.S. 15, 29, 102 S. Ct. 2202, 2210, 72 L. Ed. 2d 639 (1982).

Many post-agreement interconnection disputes would raise only state law claims, and any federal ingredient would be so far removed from the issues for judicial resolution that many claims would not even come close to what Justice Frankfurter called the "litigation provoking problem" of a federal element in a state law cause of action. See Textile Workers Union of Am. v. Lincoln Mills of Ala., 353 U.S. 448, 470, 77 S. Ct. 912, 928, 1 L. Ed. 2d 972 (1957) (Frankfurter, J., dissenting). The only possible theory that BellSouth might invoke is the idea of "protective jurisdiction" – the notion that "with regard to subjects concerning which Congress has legislative power under Article I, it can pass a statute granting federal jurisdiction and that the jurisdictional statute is itself a 'law of the United States' within Article III, even though Congress has not enacted any substantive rule of decision and thus state law is to be applied." 13B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3565 (2d ed. 1984). This theory is inapposite to this discussion, however, because we are positing that the only jurisdictional statute is 28 U.S.C. § 1331. The theory of protective jurisdiction applies only within the context of a special jurisdiction statute; no one has ever argued that section 1331 itself amounts to a grant of

46

jurisdiction to entertain state law claims on particular matters of federal concern.

Moreover, doubt on the validity of protective jurisdiction was cast by Mesa v.

California, 489 U.S. 121, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989). In that case, the

Court held that the jurisdictional provision found in 28 U.S.C. § 1442(a)(1)

required federal officers to raise a federal defense before removing to federal court.

The Court refused to take the broader position that even if no federal issue is

presented for judicial resolution, Congress can enact a statute granting federal

courts jurisdiction in order to protect the federal interest at stake. Such an

interpretation of the statute would, according to the Court, raise "serious doubt"

about to the statute's constitutionality, because it would implicate the outer

boundaries of Congress's ability to define the scope of federal jurisdiction. Mesa,

489 U.S. at 136, 109 S. Ct. at 968.

### b. Federal common law

If interconnection agreements are to be interpreted under a federal common

law of contracts, then all post-agreement disputes would raise a federal question

and thereby satisfy the "arising under" requirement of 28 U.S.C. § 1331. However,

there is no compelling reason why federal common law should be the rule of

decision in adjudications of post-agreement disputes between CLECs and ILECs.

There is no indication in the 1996 Act that Congress intended the rule of decision to be one of federal common law. The fact that the contracts are "coerced" is inapposite; as the Court held in <u>Jackson Transit Auth.</u>, <u>supra</u>, federally compelled contractual provisions are not necessarily to be construed in federal court under principles of federal common law. <u>Jackson</u>, 457 U.S. at 29, 102 S. Ct. at 2202. Rather, the Court held that the contract in that case had to be enforced in state courts under principles of state law. <u>Id.</u>

Without explicit congressional authorization for the courts to craft common-law rules for interpreting interconnection agreements, state law must be the rule of decision. Professor Chemerinsky describes the presumption against federal common law:

> There long has been a strong presumption against the federal courts fashioning common law to decide cases. The Rules of Decision Act, which was part of the Judiciary Act of 1789 and which remains largely unchanged to this day, states that "the laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decisions in civil actions in the courts of the United States, in cases where they apply." 28 U.S.C. § 1652. This law, by its very terms, seems to deny the existence of federal common law; the Rules of Decision Act commands that in the absence of positive federal law, federal courts must apply state law.

<u>See</u> Erwin Chemerinsky, <u>Federal Jurisdiction</u> § 6.1, at 350 (3d ed. 1999) (footnote omitted).

In a narrow category of cases, Congress has authorized federal courts to create a body of common law rules. See, e.g., Textile Workers Union of Am. v. Lincoln Mills of Ala., 353 U.S. 448, 77 S. Ct. 912, 1 L. Ed. 2d 972 (1957) (labor-management contract disputes); Nat'l Soc'y of Prof. Eng'rs v. United States, 435 U.S. 679, 687-88, 98 S. Ct. 1355, 1363, 55 L. Ed. 2d 637 (1978) (antitrust). Even so, the presumption and modern trend is to the contrary. The Supreme Court, for example, refused to extend its authority to craft substantive rules of antitrust law in a way that would also allow it to make post-judgment rules governing contribution among antitrust defendants. See Tex. Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 640-41, 101 S. Ct. 2061, 2067, 68 L. Ed. 2d 500 (1981). Commenting on this case, Professor Chemerinsky concludes, "Texas Industries thus reaffirms the basic principle: The federal judiciary will formulate a body of common law rules only pursuant to *clear congressional intent* for such action." Chemerinsky, supra, § 6.3.2, at 376 (emphasis added).

There is no clear congressional intent for courts to craft common law rules in the context of disputes over interconnection agreements. Indeed, the invocation of federal common law would be in considerable tension with the reverse-preemption provision in the 1996 Act and the Act's scheme of cooperative federalism (both of

which are discussed in part III.A, infra) by ceding new authority to the federal courts where none existed before, while simultaneously displacing state law.

### 3. Federal element in a state law cause of action: Merrell Dow

A final position BellSouth takes is that (a) the parties intended that their mutual obligations under the interconnection agreement track evolving standards of federal law and (b) federal law provides that ISP-bound traffic is "interstate" rather than "local" and therefore LECs need not pay each other for the termination of ISP-bound calls. This is the argument that BellSouth has advanced throughout this litigation, though one is hard pressed to find it in its "petition for judicial review." After reciting at length the definitions of various terms under FCC regulations, BellSouth states in line 31 that "[i]t was in the context of the foregoing provisions of law that BellSouth and MFS/WorldCom executed the Interconnection Agreement." In line 53, BellSouth alleges that "the PSC's Order holding that the use of local facilities to connect to an ISP constitutes Local Traffic under the Interconnection Agreement is inconsistent with the facts and contrary to the provisions of the 1996 Act." I will stretch these sentences, respectively, to mean that (a) the parties intended to track federal law and (b) federal law means $X$ rather than, as the GSPC held, $Y$. See Lykins v. Reynolds Metals Co., 725 F.2d 645, 646 (11th Cir. 1984) (holding that a district court could exercise federal tort

50

claim liability jurisdiction, despite the plaintiff's failure to allege statutory authority for such jurisdiction, because the requisite facts were alleged). Resolution of this claim boils down to contractual interpretation – namely, whether the parties intended to compensate each other for the termination of ISP-bound calls. It is therefore a state law claim.

This claim, then, squarely confronts this court with the "litigation provoking problem" of a federal issue embedded in a state law cause of action. In <u>Smith v. Kansas City Title & Trust Co.</u>, 255 U.S. 180, 41 S. Ct. 243, 65 L. Ed. 577 (1921), the plaintiff sued in federal court under the theory that the defendant-corporation violated state law when it purchased various bonds. State law delineated permissible investments to those consistent with state and federal law, and the bonds, according to the plaintiff, violated the U.S. Constitution. The Court held that the district court had section 1331 jurisdiction to hear the claim. More recently, the Court stated in <u>Franchise Tax Board v. Construction Laborers Vacation Trust</u>, 463 U.S. 1, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983), that when "it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded claims," then federal jurisdiction is appropriate. <u>Id.</u> at 3, 103 S. Ct. at 2847. In <u>Moore v. Chesapeake & Ohio R.R. Co.</u>, 291 U.S. 205, 54 S. Ct. 402, 78 L. Ed. 755 (1934), the Court took the opposite turn, holding

51

that "arising under" jurisdiction rarely exists outside of the context of federal causes of action. The Court attempted to reconcile these cases in Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 106 S. Ct. 3229, 92 L. Ed. 2d 650 (1986). There, the Court declined to find jurisdiction over a state tort claim that alleged a violation of an FDA regulation as an element of the cause of action. The Court cautioned that "careful judgments" must be made. Id. at 814, 106 S. Ct. at 3235. It ultimately concluded that since Congress did not create a federal cause of action for violations of the FDA regulation, its intent would be defeated if the Court allowed district courts to entertain an identical claim under state law. Id. at 812, 106 S. Ct. at 3234.

In the case at bar, it is unclear whether there would be jurisdiction under the framework established in Merrell Dow. On one hand, the federal element – a mere declaratory ruling by the FCC that ISP-bound traffic is "interstate" – is clearly not a federal cause of action. On the other hand, federal regulatory policy is definitely intertwined with the state law cause of action and Merrell Dow is therefore easily distinguishable. I need not undertake a jurisdictional analysis under Merrell Dow,

because I think that the district court's posture below was that of an appellate court and therefore 28 U.S.C. § 1331 is inapplicable.[11]

B. *Was the proceeding below an "original" proceeding?*

1.Are *all* 47 U.S.C. § 252(e)(6) proceedings, in which LECs seek review of PSC orders in federal district court, undertaken pursuant to the *original* jurisdiction of district courts under 28 U.S.C. § 1331?

At first blush, it may appear strange to call the district court's posture in the 47 U.S.C. § 252(e)(6) context to be that of a court asserting "original" jurisdiction. After all, the district court is reviewing the ruling of a lower body, and the district court's role therefore seems to be "appellate" in nature. However, there is a colorable argument that *all* such proceedings are, in fact, "original." If this argument prevails, then the proceeding in the district court below was an "original" proceeding, and the district court might have had jurisdiction over the state law claim depending upon how an analysis of the case under Merrell Dow would be resolved.

a. "Yes": A potential argument

In Verizon, the Court asserted that section 252(e)(6) may not be a jurisdictional provision; rather, it might be a provision that confers a private right

---

[11]I ultimately conclude that there is jurisdiction over this state law cause of action under the supplemental jurisdiction statute, 28 U.S.C. §1367, in part IV, infra.

of action.  See Verizon, 122 S. Ct. at 1759  ("Section 252 does not establish a distinctive review mechanism for the commission actions that it covers . . . and it does not distinctively limit the substantive relief available.  Indeed, it does not even mention subject-matter jurisdiction, but reads like a private action.").   In the same passage, the Court went on to cite Steel Co., 523 U.S. at 90-91, 118 S. Ct. at 1010-11, for  the proposition that "even a statutory provision that uses the word 'jurisdiction' may not relate to 'subject matter jurisdiction.'"  Thus, if one takes the Court's language seriously, then there must be a separate jurisdictional basis for all § 252(e)(6) actions in the district courts, because § 252(e)(6) does not have anything to do with subject-matter jurisdiction and is merely a cause of action.

One must ask, then, what is the jurisdictional basis for district court review of accept-or-reject determinations that PSCs must make pursuant to § 252(e)(1)?  Since there must be a jurisdictional basis outside of § 252(e)(6), then it is tempting to look at 28 U.S.C. § 1331.  That provision states: "The district courts shall have *original* jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  The italicized term is striking: section 1331 is about "original" rather than "appellate" jurisdiction.  Suppose, for example, that a PSC arbitrates an interconnection agreement.  Suppose further that a CLEC feels that the PSC has not required the ILEC to meet all of the obligations that is required of

54

it under 47 U.S.C. § 251, and it seeks review of the PSC's determination in federal district court. Is the proceeding before the district court an "original" proceeding? If it is not, then § 252(e)(6) is without effect; Congress drafted a private cause of action, but district courts have no jurisdiction to review PSCs because Congress did not amend 28 U.S.C. § 1331 to provide for appellate jurisdiction in the district courts.

One option is contend that jurisdiction under section 1331, in the context of an appellate proceeding to resolve a single federal claim, is not troublesome. That may be the position of Justice Souter who, in a concurring opinion joined by Justice Breyer and Justice Ginsburg, stated that the proceeding in Verizon was an "appellate" proceeding while simultaneously agreeing that jurisdiction existed pursuant to 28 U.S.C. § 1331. Verizon, 122 S. Ct. at 1763 (Souter, J., concurring) ("Verizon accordingly seeks not a simple order of relief running against the state commission, but a different adjudication of *a federal question by means of appellate review in Federal District Court*, whose jurisdiction to entertain the claim of error the Court today has affirmed.") (emphasis added). But that is not a

satisfactory result, because section 1331 clearly says the word "original" and says

nothing about "appellate" jurisdiction in the district courts.[12]

After <u>Verizon</u>, we are thus left with four possible conclusions: (1) appellate

jurisdiction and 28 U.S.C. § 1331 can coincide with respect to the same claim;[13] (2)

47 U.S.C. § 252(e)(6) is surplusage; (3) all proceedings before district courts under

47 U.S.C. § 252(e)(6) are "original" proceedings; or (4) the Court's private-right-

of-action discussion was *dicta* and 47 U.S.C. § 252(e)(6) is, in fact, a jurisdictional

provision – a special, closely cabined conference of appellate jurisdiction upon

district courts to review PSC accept-or-reject determinations. The first two are

clearly wrong, leaving only the last two options. If the third option is correct, then

---

[12]The majority of this court, like the <u>Verizon</u> concurrence, evidently believes that 28 U.S.C. § 1331 encompasses appellate jurisdiction. This is the only conclusion one can reach from the majority's holding that "[T]he federal district court had jurisdiction under 28 U.S.C. § 1331 to review that decision *on appeal*." As the <u>Verizon</u> majority noted, however, "28 U.S.C. § 1331 is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments." <u>Verizon</u>, 122 S. Ct. at 1759 n.3. Since the majority of this court (correctly, in my view) considers the proceeding before the district court to be an "appeal," I do not read the majority opinion as standing for the opposite proposition – namely, that the proceeding was in fact an "original" action. The majority thus reads the word "appellate" into 28 U.S.C. § 1331. I contend that this holding is troubling to say the least.

[13]This is an unattractive option not only because it violates the plain language of 28 U.S.C. § 1331, but also because the <u>Verizon</u> majority expressly asserted that "28 U.S.C. § 1331 is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments." <u>Verizon</u>, 122 S. Ct. at 1759 n.3.

I would be willing to embrace the idea that the proceeding below was an "original" proceeding  and I might therefore find jurisdiction under 28 U.S.C. § 1331 if this result is in accordance with Merrell Dow.

### b.  "No": The Better Argument

A reading of Verizon that would tag the nature of district court review of PSC orders with the "original" label  poses several problems that ultimately force me to take option four rather than option three.  First, anyone familiar with Anglo jurisprudence would believe that the district court's posture in the accept-or-reject setting is that of an appellate court.  Compare Black's Law Dictionary 98 (6th ed. 1990) (defining "appellate jurisdiction" as "jurisdiction to revise or correct the proceedings in a cause already instituted and acted upon by an inferior court, or by a tribunal having the attributes of a court"), with id. at 1099 (defining "original jurisdiction" as "jurisdiction to consider the case in the first instance").  In the example of the CLEC challenge described above, the PSC considers the case "in the first instance," while the district court is being asked to "correct the proceedings in a cause already instituted and acted upon" by "a tribunal having the attributes of a court."

More importantly, 47 U.S.C. § 252(e)(5) provides that the FCC is to make the accept-or-reject determination if the PSC does not act.  As Justice Souter points

out in his opinion, see Verizon, 122 S. Ct. at 1763 n.5 (Souter, J., concurring), there is no special review statute for the FCC in the 1996 Act. Rather, the FCC is reviewed pursuant to its ordinary review statute. See 28 U.S.C. § 2344. That provision states that aggrieved parties may file a petition to review the FCC's order in the court of appeals where venue lies. Clearly the action taken in the latter case is an "appeal." One does not, for example, say that a party aggrieved by an agency order files an "original" action in a court of appeals. Rather, one would say that the "original" proceeding takes place within the agency and that the proceeding before a court of appeals is an "appeal." I think it would strain logic to call a proceeding in a court of appeals challenging the FCC's accept-or-reject determination an "appeal" while simultaneously contending that an identical proceeding in a district court challenging a PSC's accept-or-reject determination is an "original action."

Two other considerations inform my conclusion that the proceedings before district courts on review of PSC orders are appellate proceedings. First, three Justices of the Supreme Court agreed with an opinion that explicitly called the district court's posture to be that of an "appellate" court.[14] Second, many courts

_____

[14] As will be discussed, Justice Souter could easily have endorsed the notion that the claim in Verizon entailed a claim of original jurisdiction, whereas judicial review by district courts of accept-or-reject determinations are appellate in nature.

have held that district courts must give deference to certain PSC determinations,[15] and deference is a hallmark of appellate review.

Since district court review of PSC accept-or-reject determinations is an "appellate" rather than "original" proceeding, this leaves me with option four: I decline to read the Court's suggestion that 47 U.S.C. § 252(e)(6) is a "private right of action" as a holding. Since this conclusion is, in fact, the best reading of the Court's language, I read the Court's discussion as *dicta* and distinguish the present case from Verizon.

The Verizon Court never analyzed whether the 47 U.S.C. § 252(e)(6) is a private right of action. It never invoked the factors employed in Cort v. Ash, 422 U.S. 66, 78, 95 S. Ct. 2080, 2088, 45 L. Ed. 2d 26 (1975), for determining whether a statute creates a private cause of action; nor did it engage in any kind of analysis whatsoever. Rather, it was merely attempting to reinforce its argument for the unexceptional proposition that 47 U.S.C. § 252(e)(6) does not cabin the original federal question jurisdiction of district courts. Indeed, the Court expressly reserved

Since he believed that Verizon entailed an appellate proceeding, he must certainly believe that district court review of an accept-or-reject determination is an appellate proceeding.

[15]See, e.g., Southwestern Bell Tel. Co. v. Apple, 309 F.3d 713 (10th Cir. 2002) (collecting cases using the arbitrary-and-capricious standard); GTE South, Inc. v. Morrison, 199 F.3d 733, 745 (4th Cir. 1999) (employing "substantial evidence" review).

59

the question of whether § 252(e)(6) amounts to a jurisdictional grant, concluding that "even if § 252(e)(6) does not confer jurisdiction, it at least does not divest the district courts of their authority under 28 U.S.C. § 1331 to review the Commission's order for compliance with federal law." Verizon, 122 S. Ct. at 1758. My reading is entirely consistent with this principle: it reads § 252(e)(6) as an *expansion* of federal jurisdiction because cases "arising under" federal law can still be brought in federal district court as an *original* matter under 28 U.S.C. § 1331, and appeals from PSC accept-or-reject determinations can be brought in federal district court pursuant to § 252(e)(6).

My reading is consistent with the facts in Verizon. In that case, the plaintiff claimed that federal law precluded the Maryland PSC from ordering the payment of reciprocal compensation, notwithstanding the PSC's conclusion that, under principles of state contract law, the parties agreed to pay each other for the termination of ISP-bound calls. As the Court put it: "Verizon [sought] relief from the Commission's order on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail." Verizon, 122 S. Ct. at 1758 (citing Shaw v. Delta Airlines, Inc., 463 U.S. 85, 96, 103 S. Ct. 2890, 77 L. Ed. 490 n.14 (1983), which held that litigants may assert a private right of action for preemption under the Supremacy Clause). The

60

claim in Verizon, in short, was one that was brought to the district court as an

original matter. The PSC never passed on the issue; it was precisely the PSC's

action that was allegedly illegal under federal law. The claim was not merely an

error in legal judgment by a lower body. As will be discussed infra, the latter is

what we have here – a claim of the *appellate* variety.

> 2. Was the proceeding below, in which BellSouth sought review of the PSC Order in federal district court, undertaken pursuant to the *original* jurisdiction of the district court under 28 U.S.C. § 1331?

The answer to this question is a resounding "no." As stated in part II.A.1,

BellSouth abandoned its Verizon-like claim that the GPSC was preempted by

federal law and therefore could not order the payment of reciprocal compensation

fees for ISP-bound traffic. The district court had original jurisdiction over this

claim, because the crux of the claim is that the PSC did something illegal. A

private right of action – whether under the Constitution directly (pursuant to Shaw)

or 42 U.S.C. § 1983 – provides the vehicle for such a claim. The only potential

claim left is the state law claim with a federal element. See supra part II.A.3. In

short, BellSouth argues that (a) the GPSC agreed that the parties intended to track

federal law[16] and (b) the GPSC made a legal mistake when it found that, as a matter

---

[16]This is a debatable proposition – both in terms of what the parties intended and what the GPSC actually held.

61

of federal law, ISP-bound traffic is "local" rather than "interstate." This is merely a claim of legal error – a claim fit for an appeal, but not an original action. This is so even if BellSouth dresses up its claim by seeking declaratory relief.

Indeed, BellSouth itself must have believed that the proceeding below was an "appellate" proceeding. If it were an original proceeding, BellSouth would have asked the district court to ignore the PSC's Order entirely. Instead, it argued before the district court that (a) the GPSC believed that the parties intended to track federal law and (b) that this conclusion was correct, but that the GPSC got the law part wrong. It asked the court, in short, to give vitality to part of the GPSC's analysis rather than ignoring it entirely. Moreover, line 57 of BellSouth's "petition for judicial review" asks the district court to "reverse" the PSC Order because it was "erroneous as a matter of law." That language is typical of appellate proceedings, not original proceedings.

For all of these reasons, I would hold that the posture of the district court in this case was that of an appellate court. While district courts are granted appellate jurisdiction within the narrow confines of 47 U.S.C. § 252(e)(6), they do not have appellate jurisdiction pursuant to 28 U.S.C. § 1331. The only remaining strategy for the parties is to argue that this case does, in fact, come within the narrow

62

confines of 47 U.SC. § 252(e)(6), or else supplemental jurisdiction exists under 28

U.S.C. § 1367.


III. Section 252(e)(6) Jurisdiction

A. *The source of PSC authority to interpret and enforce interconnection agreements is not section 252(e)(1), but residual authority reserved to states under the 1996 Act*

Proponents of federal jurisdiction are eager to find that the source of PSC

authority to interpret and enforce voluntary agreements resides in section 252(e)(1)

rather than residual authority under the 1996 Act,[17] because the jurisdictional

provision – section 252(e)(6) – restricts federal review only to PSC determinations

made under "this section," and section 252(e)(1) contains the section's only

operative list of what "determinations" PSCs may make.

I am convinced that PSC authority does *not* reside in section 252(e)(1). My

primary reason is that the plain language of the 1996 Act says nothing of the sort. I

have looked long and hard at the provision, and I find only this language: "A State

commission to which an agreement is submitted shall *approve or reject* the

---

[17]Both parties in this case are, for various reasons, eager to assert federal jurisdiction. I note that it is incumbent upon the federal courts to assess their own jurisdiction, even if it does so without the benefit of an adversarial presentation. If the parties do not raise the question of lack of jurisdiction, it is the duty of the federal court to determine the matter sua sponte. See Atlas Life Ins. Co. v. W.I. Southern Inc., 306 U.S. 563, 572-73, 59 S. Ct. 657, 662, 83 L. Ed. 987 (1939).

agreement, with written findings as to any deficiencies." 47 U.S.C. § 252(e)(1) (emphasis added). BellSouth asks this court to insert by judicial fiat the following additional language: "State commissions shall also enforce and interpret interconnection agreements if any post-agreement dispute arises." It is up to Congress, not judges, to make this proposed statutory amendment, and I decline to read into the statute language that does not exist. To the majority, it would not make sense to grant PSCs authority to ensure that interconnection agreements comply with the requirements of the 1996 Act on the front end without also instructing PSCs to engage in post-agreement adjudication on the back end. I will show in due time why Congress's choice made perfect sense. For now, it is enough to say that the authority is not found within the text of 47 U.S.C. § 252(e)(1). "[O]ur problem is to construe what Congress has written. After all, Congress expresses its purpose by words. It is for us to ascertain – neither to add nor to subtract, neither to delete nor to distort." 62 Cases More or Less, Each Containing Six Jars of Jam v. U.S., 340 U.S. 595, 596, 71 S. Ct. 515, 518, 95 L. Ed. 566 (1951).

Aside from the obvious separation-of-powers concern, there are two additional problems with judicially manipulating section 252(e)(1) so as to insert language about post-agreement adjudication. First, since this interpretation would

give federal courts jurisdiction to review *all* interconnection disputes under section 252(e)(6), such as price and performance disputes, all of the problems discussed in part III.B, infra, apply. Second, this reading would foreclose states from allocating adjudicative authority to enforce and interpret interconnection agreements to state trial courts rather than state PSCs, and Congress likely did not intend such a result. Suppose, for example, that a state wants its trial courts to make the initial decision to approve or reject an interconnection agreement rather than its PSC. It could not do this under the clear language of the statute, which says that the authority to approve or reject an interconnection agreement must rest with a state PSC or, if the PSC does not act, with the FCC. See 47 U.S.C. § 252(e)(1), (e)(5). This mandatory scheme makes sense, since the approve-or-reject decision is a policy determination that ought to rest with an expert agency. Suppose, however, that a state makes the following conclusion: "We (State *X*) understand that policy decisions, such as the decision to approve or reject interconnection agreements, ought to rest with our PSC. But we do not feel comfortable allowing public service commissioners, many of whom are untrained in the law,[18] to immerse themselves in the business of

---

[18]For example, the 2001 GPSC Chairman, Lauren "Bubba" McDonald, Jr., does not have a law degree and was in the hardware business prior to his appointment to the Commission. In addition to his commission duties, McDonald is currently involved in the funeral home business. See Commissioner Biographies, at http://www.psc.state.ga.us/pscinfo/bios/htm (last visited Nov. 6,

ascertaining contractual intent and deciding other issues that require skill in applying contract law. Therefore, we make the decision to allocate this adjudicative power to state trial courts rather than our PSC." This sounds like a perfectly reasonable conclusion, and nothing in the statute explicitly prevents it in my view. Moreover, the reverse-preemption provision of the 1996 Act, Pub. L. No. 104-104, 110 Stat. 56, 143 (1996) (codified at 47 U.S.C. § 152(c)(1) note),[19] would seem to countenance against a conclusion that federal law preempts states from allocating judicial power in this fashion if they so desire. Yet under the proposed interpretation, PSC adjudicative power, like the power to approve or reject interconnection agreements, stems from section 252(e)(1), which places this authority *exclusively* with state PSCs and not with state courts or any other entity the state deems appropriate. Indeed, under the proposed interpretation, if a state PSC refrains from adjudicating contract disputes (perhaps because a state law gives this power only to its trial courts), the FCC would be given the task of interpreting

2002).

[19]The provision states: "This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments."

66

the contract by default[20] — likely under principles of state contract law![21]  This

bizarre result cannot be what Congress intended.

It is not section 252(e)(1), but rather residual authority left to states under the

1996 Act that gives states (and potentially PSCs, if the state so chooses) authority to

interpret and enforce interconnection agreements.[22]  By enacting this novel scheme

of cooperative federalism, Congress deliberately preserved state regulatory bodies

as key vehicles for driving the transition to competition.  Prior to 1996, intrastate

regulation was left largely in the hands of states.[23]  The reverse-

---

[20]See 47 U.S.C. § 252(e)(5) ("Commission to act if State will not act").

[21]See infra part III.B.3.

[22]I agree with the Fourth Circuit on this point.  See Bell Atl. Md. Inc. v. MCI WorldCom, Inc., 240 F.3d 279, 299-303 (4th Cir. 2001), rev'd on other grounds, Verizon Md. Inc. v. Pub. Serv. Comm'n of Md., __ U.S. __, 122 S. Ct. 1753, 152 L. Ed. 2d 871 (2002).

[23]  Professors Benjamin, Lichtman, and Shelanski write:
From its creation in 1934, the FCC has always shared jurisdiction over telephony with state regulators.  The 1934 Act's limitation of federal authority is clearly stated, if not so easily implemented in practice: the Act is not to be construed "to give the Commission jurisdiction with respect to . . . practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier."  47 U.S.C. § 152(b) (emphasis added).  Indeed, the 1934 Act on its face restricts FCC jurisdiction to "interstate and foreign communication by wire or radio."  47 U.S.C. § 152(a) (emphasis added).  The Act thus appears to keep the Commission out of the business of regulating what, in 1934, accounted for the vast bulk of telephone usage: local telephony.

preemption provision in the 1996 Act, discussed above, makes clear that any pre-1996 assignment of responsibility remains with states unless the Act explicitly takes it away.

Suppose that prior to 1996, a Bell Operating Company in State *X* desired to let a CLEC interconnect with its system (for a fee, of course). The state, invoking its exclusive authority over the intrastate arena, would (a) decide whether to permit the new entry; (b) possibly require (i) certain contractual provisions and/or (ii) state approval of the final ILEC/CLEC agreement; and (c) adjudicate any post-agreement dispute. Moreover, the state would have authority to *designate the entity charged with each particular task*. The chosen entity might well be a court, regulatory agency, or even the legislature itself. The 1996 Act altered the scope of state authority, but this alteration was only partial. For example, states no longer have the choice to deny new entry altogether, and so state authority to undertake task (a) has been completely abrogated. See 47 U.S.C. § 253 ("Removal of barriers to entry").[24] States also have little freedom to choose the entity that undertakes task

---

Benjamin et al., supra, at 610-11.

[24]Section 253 states that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." This provision put an end to state-sanctioned monopolies, demonstrating Congress's new confidence that local competition would not lead to wasteful duplication of resources, but rather to more consumer choice and lower rates.

(b), because section 252 requires that state PSCs (rather than, say, courts or legislatures) approve or reject voluntary agreements; otherwise, the FCC will conduct the section 252 tasks itself. The 1996 Act also defines the basic terms of the agreements, since, even in the "voluntary" setting, compulsory arbitration always looms in the background. As for task (c), the 1996 Act is silent. Therefore, the natural conclusion one must reach in light of the reverse-preemption provision and scheme of cooperative federalism is that states still retain the authority to decide which entity engages in post-agreement adjudication. This conclusion, then, is in considerable tension with the proposition that PSC authority to adjudicate post-agreement disputes stems from section 252(e)(1), because such an interpretation would foreclose states from choosing a different adjudicative entity. This tension, in conjunction with the plain language of the statute and host of problems discussed in part III.B, infra, causes me to believe that the *source* of the state's authority (and ultimately the PSC's authority, if the state legislature chooses to vest a PSC with such authority) stems from residual authority under the 1996 Act rather than section 252(e)(1).

B. *Why there is no jurisdiction under section 252(e)(6)*

1. Plain language

69

Having determined that GPSC's authority to enforce and interpret interconnection agreements does not arise from section 252(e)(1), I know that federal jurisdiction does not exist under section 252(e)(6) to review the GPSC's adjudication. This is because the two provisions work in tandem. The judicial review provision, section 252(e)(6), provides that review of a PSC determination in federal court is for the purpose of determining "whether the *agreement* . . . meets the requirements of . . . *this section*."[25] The italicized portions of the statute are instructive, leading me to conclude that the only subject of judicial review in the federal courts is the agreement's compliance with the 1996 Act, not other issues such as post-agreement disputes about the parties' objective contractual intent. The scheme, then, is a simple one: under section 252(e)(1), a PSC is empowered to make one determination – the decision to "approve or reject" an agreement with

---

[25]Section 252(e)(6) reads: "[A]ny party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement *or statement* meets the requirements of *section 251 of this title* and this section." The two italicized portions have been removed in the quote found in the text for the sake of clarity. The "statement" referred to concerns a Bell Operating Company's option to file a "Statement of Generally Available Terms" pursuant to section 252(f). This is not relevant to the voluntary interconnection agreement setting. Similarly, "section 251 of [title 47]" is irrelevant to the voluntary agreement context, except for the section 251(a) discussion of the "general duties" of LECs.

"written findings as to any deficiencies."[26]  The grounds for rejecting a voluntary

agreement are found in section 252(e)(2)(A), which precludes the PSC from

rejecting an agreement for any reason other than a finding that it is discriminatory

(against, say, a third-party CLEC) or flunks the public interest test.  Appellate

review of the approve-or-reject determination rests exclusively with the federal

district court.  Section 252(e)(4) makes this clear by precluding state court review

of the PSC decision,[27] and section 252(e)(6) provides for federal review of the

_____

[26]Such findings are important for judicial review of the PSC's decision to approve or reject an interconnection agreement.

[27]The provision provides in part: "No State court shall have jurisdiction to review the *action of a State commission in approving or rejecting an agreement under this section*."  47 U.S.C. § 252(e)(4) (emphasis added).   This is the flip side of section 252(e)(6), which gives federal courts the power of judicial review over the PSC's approve-or-reject determination.  Together, the provisions make that power *exclusive*.  The italicized language confirms what should be obvious from the statute: the only affirmative duty of a state PSC under section 252(e)(1) is to approve or reject an agreement and nothing more.  Indeed, there is no operative clause prescribing any duty under "this section" besides the duty prescribed in section 252(e)(1) to approve or reject an agreement.  The PSC's determination to approve or reject, then, is the key triggering event, and the rest of the statutory provisions relate back to that determination, filling in procedural details such as what reasons the PSC must give for its decision, what happens if the PSC chooses not to make the approve-or-reject determination at all, and how the approve-or-reject determination is appealed. Section 252(e)(6) is therefore inapposite when it comes to defining the PSC's substantive duty, which is found only in section 252(e)(1).  Indeed, section 252(e)(6) by its terms covers only "Review of State commission actions" – a *procedural* rather than *substantive* matter.  One can hardly conclude, then, that because the "approve or reject" language is found in sections 252(e)(1) and 252(e)(4) but not section 252(e)(6), this somehow means that state commissions must undertake additional responsibilities besides that

PSC's determination that an agreement does not comply with the requirements of the 1996 Act – namely, the requirements that, in the voluntary agreement setting, agreements meet the public interest test and not discriminate against other CLECs. The statute simply has nothing to say about post-agreement adjudication.

### 2. Cooperative federalism and the presumption against federal jurisdiction

Clearly, state commission decisions that are not expressly designated for review in federal court are left for review by state courts, as provided by the existing law of the state that created the state commission. The reverse-preemption provision of the 1996 Act stands for the proposition that state jurisdiction should be retained (to the exclusion of federal jurisdiction) unless there is a clear statement to the contrary. Another clear statement rule is at play in this case: because federal courts are courts of limited jurisdiction, when their jurisdiction is created by statute, the statute is strictly construed. See Turner v. Bank of N. Am., 4 U.S. (4 Dall.) 8, 11, 1 L.Ed. 718 (1799) (stating that because federal courts are of limited

---

which is expressly enumerated in section 252(e)(1). The fact that this argument is even made shows the hollow logic of the pro-jurisdiction camp. They realize that section 252(e)(6) ties judicial review to section 252(e)(1), so they must somehow conclude that post-agreement adjudication is an affirmative duty under the latter section. Yet they also realize that section 252(e)(1) says nothing of the sort, so they strain to find an affirmative duty to engage in post-agreement adjudication outside of section 252(e)(1). They cannot have it both ways. One need not strain so mightily under a natural reading of the statute, however.

72

jurisdiction, "the fair presumption is . . . that a cause is without its jurisdiction, until the contrary appears."); see also Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union, 457 U.S. 15, 30, 102 S. Ct. 2202, 2211, 72 L. Ed. 2d 639 (1982) (Powell, J., concurring) ("Because a federal court should exercise extreme caution before assuming jurisdiction not clearly conferred by Congress, we should not condone the implication of federal jurisdiction over contract claims in the absence of an unambiguous expression of congressional intent").   The state-authority presumption of the federal scheme, combined with this venerable principle of federal jurisdiction, demands a clear statement that state review is abolished in lieu of federal review.   Both polices stand for one overarching principle: Federal jurisdiction is not to be presumed or implied.  I cannot find a clear statement; indeed, the plain language forces me to reach the *opposite* conclusion.[28]  "Thus, although the State commission may have had jurisdiction to administer and enforce interconnection agreements, review of such decisions by the commission is taken to the State courts as determined by the State review procedure preserved by the 1996 Act."  Bell Atl. Md. Inc. v. MCI WorldCom, Inc., 240 F.3d 279, 305 (4th Cir. 2001).

---

[28]The district court, for example, concluded that the "literal" interpretation of the statute would not confer jurisdiction.  It went on to adopt the "inherent" argument (discussed below) without analysis.

### 3. Special problems of deference; protective jurisdiction reconsidered

If the proponents of section 252(e)(6) jurisdiction are correct, what rule of decision must state PSCs utilize in adjudicating generic contract disputes, such as whether the parties have performed under the terms of an interconnection agreement?  And what level of deference, if any, must federal courts give to the PSC's conclusion?  Under my interpretation of the 1996 Act, the answer is easy: state entities (whether a PSC or trial court) review contracts under state law, and appeals are taken as provided by state rules of appellate review.  Under the opposing view, these questions become intractable problems which lead to absurd results, lending further credence to the proposition that federal jurisdiction was never intended by Congress.

One possible argument is that state PSCs interpret contracts according to a federal common law of contracts rather than state contract law.  I reject this view for the reasons discussed at part II.A.2.b, supra.  I also note that if federal common law is the rule of decision, and if federal courts review *all* PSC adjudications of post-agreement disputes under section 252(e)(6), then this interpretation would create considerable problems when the issue of deference is considered.  Federal

courts rarely give deference to state interpretations of federal law.[29] Indeed, federal

courts do not give deference to the federal law interpretations of state high courts,

see Martin v. Hunter's Lessee, 14 U.S. (1 Wheat) 304, 357-58, 4 L. Ed. 97 (1816),

much less to state PSC commissioners, many of whom are untrained in the law.[30]

Yet if no deference is given, there would be little point in having the PSC

adjudicate the matter in the first instance. The federal district court, giving no

deference, would have the parties relitigate all of the issues again. I cannot interpret

the 1996 Act in a way that would create such a wasteful scheme. To make the most

sense out of the initial state review, one must conclude that congress did not want

there to be *de novo* review, and that the voluntary agreements are therefore *not* to be

interpreted under principles of federal common law.

Perhaps anticipating these devastating arguments, BellSouth concedes that

the rule of decision might well be state law.[31] But if federal courts have jurisdiction

---

[29]The habeas corpus setting is the only area I am aware of. The Antiterrorism and Effective Death Penalty Act of 1996 provides that relief is available only when the state court determination is "contrary to, or involved an *unreasonable* application of, *clearly established* Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added).

[30]See supra note 18 and accompanying text.

[31]The now-FCC Chairman has also implied that state law typically provides the rule of decision: "[S]tate commissions have a duty to resolve interconnection disputes by relying on any legitimate bases (*including state law bases*), so long as those bases do not conflict with federal law." Starpower Communications, LLC,

to review the PSC's state law conclusion, then this argument is as ridiculous as the first because *federal* courts would be reviewing to see if the state agency correctly applies *state* law. Whether deference is given or not,[32] I know of no comparable scenario to this one, in which a federal court sits in judgment of a state agency or court on a complaint that sounds only in state law. As one court put it, it would be "surpassing strange to preserve state authority in this fashion and then to put federal courts in the position of overruling a state agency on a pure issue of state law." P.R. Tel. Co. v. Telecomm. Regulatory Bd. of P.R., 189 F.3d 1, 15 (1st Cir. 1999). The First Circuit concluded that "section 252(e)(6) does not confer authority on federal courts to review the actions of state commissions for compliance with state law." Id. at 13. Indeed, the federal courts might decide to certify a state contract law question to the state's high court. Proponents of jurisdiction evidently think

_____

Petition for Preemption of Jurisdiction of the Va. State Corp. Comm'n, 15 F.C.C.R. 11277, 11286 (2000) (memorandum opinion and order) ("Starpower") (Powell, Comm'r, concurring).

[32]The district court, for example, reviewed the GPSC's state law conclusion under an arbitrary-and-capricious standard rather than *de novo*. As a testament to how odd it would be for federal courts to review state entities for compliance with state law, the district court was grasping at straws to give any kind of deference that it could. After incorrectly asserting jurisdiction, I can hardly fault the district court for pulling the arbitrary-and-capricious standard out of thin air, giving only a "Cf." citation to a Supreme Court case, United States v. Carlo Bianchi & Co., 373 U.S. 715, 83 S. Ct. 1409, 10 L. Ed. 2d 652 (1963), that was about *federal* administrative law. BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., Inc., 97 F. Supp. 2d 1363, 1376 n.10 (N.D. Ga. 2000).

that Congress did *not* intend that *state trial or intermediate appellate courts*[33] review the PSC's application of state contract law – a body ultimately reviewable by the state high court. Rather, they think that Congress wanted *federal district courts* to review the PSC's application of state contract law, and that federal courts are nonetheless free to seek guidance from the state high court. This interpretation, then, would superfluously wedge federal district courts into an appellate-like scheme (akin to a state intermediate appellate court) that is ultimately resolved by the state high court on an issue of state law – surely a strange result. These problems disappear, however, when the scheme is interpreted as the plain language dictates: under section 252(e)(6), federal courts review only PSC determinations to approve or reject voluntary interconnection agreements and nothing more.

I also note that if the statutory scheme were interpreted so as to prescribe federal review of state entities on questions of state law, the scheme would push the boundaries of Congress's authority under Article III to define the scope of federal jurisdiction.[34] Without a federal rule of decision, how does such a dispute (centered

[33]In Georgia, for example, petitions for review may be filed "in the Superior Court of Fulton County or in the superior court of the county of residence of the petitioner." Ga. Code. Ann. § 50-13-19(b) (2002).

[34]"The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ." U.S. Const. art. III, § 2.

77

around a state law contract issue) "arise under" federal law? The only possible argument would be based on the theory of "protective jurisdiction" discussed in part II.A.2.a, supra. Does section 252(e)(6) amount to a special grant of appellate jurisdiction to entertain state law claims? Although this is a provocative argument, courts must interpret statutes so as to avoid difficult constitutional questions. See Mesa v. California, 489 U.S. 121, 136, 109 S. Ct. 959, 968, 103 L. Ed. 2d 99 (1989); NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 499-501, 504, 99 S. Ct. 1313, 1318-19, 1320, 59 L. Ed. 2d 533 (1979).

4.  Other circuits

Against this array of arguments consisting of (1) venerable principles of federal jurisdiction (i.e., the presumption against federal jurisdiction and the presumption against federal common law); (2) the reverse-preemption provision and the 1996 Act's scheme of cooperative federalism; (3) the constitutional avoidance canon; and (4) a host of intractable problems that federal jurisdiction would yield, one would think that proponents of jurisdiction would be able to point to an ultra-clear statement that Congress intended federal jurisdiction to exist over all run-of-the-mill disputes regarding compliance with existing interconnection agreements. As part III.B.1 demonstrates, however, the plain language of the 1996 Act leads to the *opposite* conclusion, further buttressing the argument against

78

jurisdiction under section 252(e)(6). Instead, proponents of federal jurisdiction

(both litigants and courts) point to amorphous concepts of "inherent" jurisdiction[35]

and conclusory fluff. The Fourth Circuit's assessment of other circuits' reasoning

mirrors mine:

> The Seventh circuit stated simply, "Decisions of state agencies implementing the 1996 Act are reviewable in federal district courts," without providing analysis to support this broad statement in the context of a suit challenging a commission's interpretation or enforcement actions. Illinois Bell, 179 F.3d at 570 (quoting an earlier order in the same case that was similarly devoid of jurisdictional analysis, see Illinois Bell Tel. Co. v. WorldCom Techs., Inc., 157 F.3d 500, 501 (7th Cir. 1998)). And the Eight Circuit, in dictum and without analysis, first stated its "belie[f] that the enforcement decisions of state commissions would . . . be subject to federal district court review under subsection 252(e)(6)." Iowa Utils. Bd. v. FCC, 120 F.3d at 804 n.24. This statement appeared in a footnote in a section of analysis that the Supreme Court held the Eight Circuit should not have reached because the issue was not ripe for review. See Iowa Utils., 525 U.S. at 386, 119 S. Ct. 721. Then later, it simply deferred to the FCC in finding jurisdiction. See Southwestern Bell Tel. Co. v. Connect Communications Corp., 225 F.3d 942, 946 (8th Cir. 2000).
>
> The Fifth Circuit held that "federal court jurisdiction extends to review of state commission rulings on complaints pertaining to interconnection agreements and that such jurisdiction is not restricted to mere approval or rejection of such agreements." Southwestern Bell Tel. Co. v. Public Util. Comm'n, 208 F.3d 475, 481 (5th Cir. 2000). In reaching this conclusion, the court recognized that § 252(e)(6) could be read literally to limit federal review of State commissions to decisions "approving or disapproving, or arbitrating, an interconnection agreement." Id. at 479. But the court rejected that reading because it concluded, "We do not think such a narrow construction was intended." Id. The court then reasoned that assignment to State commissions "of plenary authority to approve or disapprove these interconnection agreements necessarily carries with it the authority to interpret and enforce the provisions of [such] agreements." Id.

---

[35]Since a conclusion that federal jurisdiction exists demands a clear statement, use of the word "inherent" should be sufficient evidence that a clear statement does not exist.

<u>Bell Atl. Md., Inc.</u>, 240 F.3d at 305-06 (4th Cir. 2001) (alterations in original). Resort to the *ipse dixit* simply will not do.

　　5. <u>Chevron</u> Deference

Sensing that conclusory assertions about "inherent" jurisdiction will not carry the day, proponents of federal jurisdiction mount one last ditch effort by invoking <u>Chevron</u> deference. <u>See</u> <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Counsel</u>, 467 U.S. 837, 104 S. Ct. 2778, 80 L. Ed. 2d 694 (1984). In that case, the Court held that agency determinations are entitled to deference if (1) the statute is silent or ambiguous and (2) the agency's answer is based on a reasonable construction of the statute. <u>See</u> <u>id.</u> at 843-45, 104 S. Ct. at 2781-83. It is argued that we should give deference to the FCC's conclusion in <u>Starpower</u>, 15 F.C.C.R. 11277, ¶ 6, at 11279-80 (2000), that PSC authority to adjudicate post-agreement disputes comes from 47 U.S.C. § 252(e)(1).

I do not think <u>Chevron</u> deference is appropriate in this case. First, section 252(e)(1) lists only two possible PSC "determinations" (i.e., to approve or reject an agreement); section 252(e)(6) cabins federal jurisdiction to section 252(e)(1) determinations by its very terms. The statute is clear as a bell, and no deference is owed when the statute is unambiguous. Second, the clear statement rules and absurdities discussed above reinforce my conclusion that Congress did not intend

80

section 252(e)(6) to be a broad conferral of federal jurisdiction to review all post-agreement disputes.[36]  See Chevron, 467 U.S. at 842-43 & n.10, 104 S. Ct. at 2781-82 & n.10 (instructing courts to use "traditional tools of statutory construction" in order to ascertain congressional intent).  Third, I do not think deference is owed on a question that is ultimately about federal jurisdiction — a matter that is uniquely within the province of the judiciary to decide.  Fourth, the constitutional avoidance cannon, discussed at part III.B.3, supra, trumps Chevron deference.  See Edward J. DeBartolo Corp. v. Fl. Gulf Coast Bldg. & Const. Trades Council, 485 U.S. 568, 574-76, 108 S. Ct. 1392, 1397-98, 99 L. Ed. 2d 645 (1988).  Finally, I hesitate to give deference to an FCC Order that was based not upon the agency's expertise, but rather upon the conclusory statements of other circuits that are in no way binding on this court.[37]  The Supreme Court made clear that Chevron deference arises out of a

---

[36]As has been discussed at length, a conclusion that PSC authority to adjudicate post-agreement disputes comes from section 252(e)(1) (rather than residual authority) would, of course, make such adjudications "determinations" under "this section" and would therefore give district courts jurisdiction to review such determinations.

[37]The analysis the FCC undertook – if one wishes to call it "analysis" – comes in the form of the following statement: "These court opinions implicitly recognize that, due to its role in the approval process, a state commission is well-suited to address disputes arising from interconnection agreements."  Starpower, 15 F.C.C.R. at 11277, ¶ 6, at 11279-80.  Hardly a model of legal reasoning, the FCC's observation is inapposite because it has nothing to say about the *source* of PSC authority; a state commission is equally "well-suited" whether or not its authority arises from residual authority or from authority that resides in section 252(e)(1).

tradition of court restraint when encountering complex issues that are best suited for resolution by expert agencies. See Chevron, 467 U.S. at 865, 104 S. Ct. at 2792-93 (grounding Chevron deference in the expertise of agency decisionmakers). I do not think the Chevron Court intended that litigants be able to "launder" circuit court opinions through federal agencies and thereby make those opinions binding on other circuits,[38] even if the agency offers no analysis of its own. Any of these five reasons standing alone would eliminate the requirement of deference. All of them exist in this case, however.

### 6. Summary of section 252 (e)(6) argument

The jurisdictional question before this court – whether U.S. district courts have jurisdiction to review *all* PSC orders interpreting and enforcing voluntary interconnection agreements under 47 U.S.C. § 252(e)(6) – could be decided in one of several ways. *First,* we might conclude, as the panel did, that the silence of 47 U.S.C. § 252(e)(1) on the subject of PSC adjudication of post-agreement disputes

---

Moreover, a state legislature might think that due to its role in traditional contract adjudication and legal expertise, the state trial court is "well-suited" to address interconnection disputes. Why section 252 prevents states from making this judgment is left unexplained by the FCC decision.

[38]This analogy comes from commercial paper law, which prevents a forger from "laundering" a forged note through a holder in due course ("HDC") in order to attain HDC status. For example, a forger cannot sell a note to a party without notice of the forgery and then proceed to buy the note back from the HDC so as to attain HDC status under the shelter rule.

is tantamount to a congressional conclusion that PSCs are precluded from adjudicating interconnection disputes. *Second*, we might conclude that 47 U.S.C. § 252(e)(1) grants PSCs "inherent" authority to interpret and enforce interconnection agreements, making this a § 252(e)(1) "determination" subject to federal review pursuant to 47 U.S.C. § 252(e)(6), even as to state law issues. This is the approach taken by, among other circuits, the Fifth Circuit. See <u>Southwestern Bell Tel. Co. v. Pub. Util. Comm'n of Tex.</u>, 208 F.3d 475, 479-80 (5th Cir. 2000). This is also the approach taken by the majority of this court. *Third*, we might conclude that 47 U.S.C. § 252(e)(1) grants PSCs "inherent" authority, but that the scope of federal review is limited to whether the state commission, in construing and enforcing the interconnection agreements, correctly applied federal law. This is the approach taken by the Seventh Circuit. See <u>Ill. Bell Tel. Co. v. WorldCom Techs., Inc.</u>, 179 F.3d 566, 571-72 ("[W]e would not review those actions for compliance with state law.").[39] *Fourth,* we might read language out of the statute, judicially deleting the phrase "this section" from section 252(e)(6), thereby allowing district courts to review *all* "determinations" made by PSCs rather than the determinations made

--------

[39]One of the many problems with this interpretation is that since all PSC adjudications would be made pursuant to section 252(e)(1) rather than residual authority, there is no logical basis for systematically excluding from federal review those adjudications based solely upon state law. All PSC orders would be "determinations" under "this section" and thus subject to federal review.

pursuant to section 252(e)(1) – i.e., the accept-or-reject determination (in the voluntary agreement context).  *Fifth*, we might conclude that PSC authority resides not in 47 U.S.C. § 252(e)(1), but rather stems from state residual authority under the 1996 Act; and, moreover, federal courts have no appellate jurisdiction to review PSC post-agreement adjudications, which traditionally sound in state contract law, under section 252(e)(6).  This is the conclusion I reach.[40]

The Fourth Circuit recognized that interconnection disputes "may amount to tens of thousands of cases."  See Bell Atl. Md., Inc. v. MCI WorldCom, Inc., 240 F.3d 279, 305 (4th Cir. 2001); see also Kathleen Wallman, A Birthday Party: The Terrible or Terrific Two's?  1996 Federal Telecommunications Act, 51 Fed. Comm. L.J. 229, 240 (1998) (finding that roughly 2,400 interconnection agreements had been reached by 1998).  One would think that if Congress had wanted this mountain of interconnection disputes to wind up in federal court, it would have clearly said so.  This potentially enormous increase in the federal docket, in conjunction with the plain language of the statute, the constitutional avoidance canon, two clear statement rules, and a host of anomalies that would ensue,[41] leads me to the

---

[40]This is also the conclusion the Fourth Circuit may reach on remand from the Supreme Court's Verizon decision.

[41]Various interpretations of 47 U.S.C. § 251 would, for example, (1) make the statutory scheme wasteful by allowing for *de novo* review in federal district court (if federal common law is the rule of decision) or (2) entail federal court

conclusion that federal courts do not have jurisdiction to hear *all* PSC orders that interpret and enforce interconnection agreements. Rather, appellate review in the district courts is confined to PSC accept-or-reject determinations. The district court therefore did not have section 252(e)(6) jurisdiction over BellSouth's claims.

IV. Section 1367 Jurisdiction

The supplemental jurisdiction statute provides that "in any civil action of which district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). In this case, the district court had original jurisdiction over the (now-abandoned) claim of federal preemption. See part II.A.1, supra. Therefore, the district court had discretion to assert jurisdiction over the supplemental claim for administrative review – even though that claim is appellate in nature. See City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 118 S. Ct. 523, 139 L. Ed. 525 (1997) (holding that a district court had *supplemental* jurisdiction over one claim, a challenge to an

review of state agencies on matters of state law (if state law is the rule of decision). I have also noted many other problems that section 252 jurisdiction would yield.

agency action under the state's administrative procedure statute, because it had

*original* jurisdiction over a second claim that the ordinance administered by the

agency violated the U.S. Constitution – a claim that was asserted for the first time in

the district court). Therefore, absent my conclusion in part V, <u>infra</u>, the district

court would have been within its discretion to assert jurisdiction over the

supplemental claim.[42] In this context, the district court should have assumed the

posture of a Georgia superior court, which would ordinarily entertain administrative

challenges to PSC orders. <u>See</u> Ga. Code. Ann. § 50-13-19(b) (2002). I emphasize

that the decision to assert supplemental jurisdiction was a discretionary call for the

district court to make in the first instance, because the "original" <u>Verizon</u>-like

claim in this case was quickly rejected by the district court, and also because the

U.S. Supreme Court cautioned that principles of comity might warrant abstention in

scenarios like the one in <u>College of Surgeons</u>, 522 U.S. at 174, 118 S. Ct. at 534.

V. Unclear GPSC Order

---

[42]The district court evidently did not understand BellSouth to be claiming that (a) the parties intended to track federal law and (b) federal law provided that ISP-bound calls are not subject to the 1996 Act's reciprocal compensation requirement. This conclusion is understandable given the cryptic "petition for judicial review" described in part II.A.3, <u>supra</u>.

After examining the GPSC's Order in this case, I am unable to conclude, as did the district court, that the GPSC in fact determined that the parties agreed to pay reciprocal compensation fees for ISP-bound traffic even though they were not required to do so under federal law. Much like BellSouth's cryptic "petition for judicial review," I am unable to make sense of the GPSC's Order. On one hand, it claims that the parties "agreed" to deem ISP-bound traffic "local," in addition to pointing to factors such as usage of trade and course of dealing. The latter are state law interpretative tools used to shed light on the parties' intent at the time of contracting. See Restatement (Second) of Contracts §§ 219-22 (1981); U.C.C. § 1-205 (1977). Therefore, BellSouth's position that the GPSC's holding was driven *solely* by the fact that it determined, as a matter of law, that such traffic is "local" is incorrect. On the other hand, there is no question that the GPSC's erroneous assessment of federal law was a significant factor in its conclusion, occupying most of the pages in the GPSC Order. The fact issue in this case – whether the parties' objective intent called for the payment of reciprocal compensation fees for ISP-bound traffic – was never clearly answered by the GPSC. Did the parties intend to track federal law? Or did they intend to pay each other for the termination of ISP-bound calls notwithstanding federal law? These are fact questions that must be clearly answered in the first instance by the GPSC or a court exercising original

87

jurisdiction. The district court's conclusion that the parties intended to compensate each other for the termination of ISP-bound traffic notwithstanding federal law was based on a conclusion that the GPSC had answered the question in the first instance. I do not believe that the GPSC necessarily arrived at that conclusion, but I am unsure. I feel that the best course would be to remand the case to the GPSC, which can consider the FCC's most recent ISP ruling and clearly articulate the basis for its conclusion. See Mail Order Ass'n of Am. v. United States Postal Serv., 2 F.3d 408, 434 (D.C. Cir. 1993) (holding that a court must remand unless it is clear that the agency would have reached the same decision in the absence of the legal mistake); Cissell Mfg. Co. v. U.S. Dep't of Labor, 101 F.3d 1132, 1136 (6th Cir. 1996) ("[If an agency] makes an error of law in its administrative proceedings, a reviewing court should remand the case to the agency so that the agency may take further action consistent with the correct legal standards.").

## VI. Conclusion

The crux of BellSouth's position is that the GPSC made an error of law in its analysis of BellSouth's "federal element" state law claim, and that the district court should have corrected the alleged error. BellSouth cites only two possible grounds for jurisdiction in this case – section 1331 and section 252(e)(6). Each of these

positions suffers from a fatal flaw.  The district court lacked section 1331 jurisdiction because the proceeding before the court on the "federal element" claim was an "appellate" rather than an "original" proceeding.  Section 252(e)(6) is equally unavailing because that statute cabins district court appellate jurisdiction to accept-or-reject determinations that PSCs make pursuant to 47 U.S.C. § 252(e)(1).

The district court did, however, have supplemental jurisdiction over BellSouth's "federal element" claim.  This is because BellSouth initially brought another claim in addition to its claim for administrative review – namely, that the GPSC was federally preempted from ordering the payment of reciprocal compensation fees for ISP-bound calls.  Thus, although the district court did not have jurisdiction under section 1331 to hear BellSouth's claim for administrative review, it had supplemental jurisdiction over that claim (notwithstanding its appellate nature) because the court had original jurisdiction over the preemption claim.

Even though the district court had supplemental jurisdiction over the "federal element" claim, it is unclear what, precisely, the GPSC held with regard to that claim. I would therefore vacate the decision by the district court and remand the case to the district court with instructions to remand to the GPSC.